# CHARLESTON.

52 296
f62 141

STATE *v.* HILL.

Submitted September 4, 1902. Decided December 13, 1902.

1. WITNESS—*Evidence.*

A witness will not be compelled to answer a question touching matter not material, but collateral, to the issue, if the answer will degrade him. But the privilege to refuse to answer is personal to him, and cannot be used by a party. If the wit-

ness does not refuse to answer, it is in the discretion of the court to allow, or refuse to allow, an answer. If the court refuse to allow an answer, it is not at all the ground of exception by a party; nor is it such ground of exception, if the court allows an answer, except, perhaps, when such discretion is grossly abused to the manifest harm of a party. (p. 298).

2.  EVIDENCE—*Error—Witness.*

The mere putting of a question the answer to which may degrade a witness, which he refuses to answer by leave of the court, is not ground of exception for error. (p. 299).

3.  EVIDENCE—*Error—Jury.*

The general rule is that if. improper evidence has been given to a jury, and is afterwards withdrawn. by the court from the consideration of the jury, that cures any error committed by its introduction; but there may be instances where such a strong impression has been made upon the minds of the jury by illegal and improper testimony that its subsequent withdrawal will not remove the effect caused by its withdrawal, and then the error will call for a new trial. (p. 299).

4.  EVIDENCE—*Cross Examination—Error.*

On cross-examination to discredit a witness he may be asked whether he has been confined in the penitentiary; and if he answers that he has been, it is no ground of exception by the party introducing the witness. It is not necessary in such case to produce the record of conviction. (p. 301).

5.  QUESTIONS OF FACT—*Jury—Verdict.*

Again the court holds that a verdict of a jury upon the facts resting upon the weight of the evidence, the inferences to be drawn therefrom and the credibility of witnesses, has almost uncontrollable finality, and is sacred in law beyond reversal by this Court. This Court can not merely weigh evidence in competition with a jury. It can set aside such a verdict only where it is very plainly and manifestly contrary to, or without sufficient evidence, and plainly inflicts injustice. (p. 304).

Error to Circuit Court, Marion County.

A. T. Hill was convicted of receiving stolen goods, and brings error.

*Affirmed.*

T. N. PARKS and W. S. MEREDITH, for plaintiff in error:
C. POWELL and ATTORNEY GENERAL for the State.

BRANNON, JUDGE:

A. T. Hill was indicted in the circuit court of Marion County

for breaking and entering a freight car of the Baltimore and Ohio Railroad Company and stealing from it a lot of shoes, the indictment containing counts for such breaking and stealing, and also a count for receiving the shoes knowing them to be stolen. He was acquitted on the counts charging the breaking into the car, but was convicted on the count for receiving, and was sentenced to the penitentiary for five years. He brings the case here, complaining of the sentence in several respects.

The wife of the prisoner as a witness stated that the goods were brought to her husband's house by two men and that three females were living there, who were witnesses for the prisoner to that fact, and the prosecution asked her if it was not a fact that all three were prostitutes, and whether she did not know they were when they came to her house, and whether she did not know that men visited them; and whether men had not paid the witness for the time they were visiting those girls. The court told the witness that she need not answer any question tending to incriminate or disgrace her, and instructed the jury that such evidence could only be admitted as affecting the credit of the witness, not as tending to show guilt on the part of the prisoner; and afterwards upon further consideration the court totally excluded it, and told the jury to disregard it in coming to a verdict. Is there in this any error hurtful to the prisoner? The answers of the witness fixed nothing on her save that she had heard the girls were prostitutes, but the prisoner claims that the mere propounding of these questions was error to his prejudice, because tending to show that the witness kept a house of bad repute, and thus degraded her and diminished her credit. Of course, there is no question that where the answer to a question may tend to subject the witness to a criminal or penal liability (not a mere civil one) no answer will be required if the witness himself objects on that score, whether the matter is relevant or not; but how as to evidence merely tending to degrade the character? The law is that where the question is relevant or material to the matter on trial, the witness must answer, however much it disgraces or discredits the character, because the demands of public justice require this. The witness can set up no privilege in that case; but where the question introduces matter not relevant to the issue on trial, but

forcign or collatcrial to it, if the witness objects to answer, he will not be compelled to do so. This privilege, however, like the privilege of refusal to answer a criminating question, is personal to the witness. A party cannot insist upon it. If the witness do not object to answer, adverse counsel cannot, so as to make it a subject of error. Though the witness do not object, it seems that it is still within the discretion of the court on its own motion, or at the suggestion of counsel, to allow or refuse the question. It may be a question merely intended to embarrass the witness, worry the witness, exposing indecent things in court, tending to corrupt morals, and answering no fairly useful purpose on the trial. It almost invariably wounds the feelings of the witness and his family. It removes the mantle of oblivion and forgiveness by re-opening the pages of years past and exposing acts done in the infirmity of human nature amid the temptations that beset life. If this door is open wide, the witness-stand will be a terror, men will suppress evidence from fear of it to the injury of public justice, and it will threaten both the worthy and unworthy witness, and be a cross upon which attorneys, too zealous in their cause, will crucify witnesses to suit their own end. It would tend to disorder in courts. Rarcly, very rarely, should it be tolerated. The rule that a witness can only be impeached by evidence of general reputation as regards truth and veracity would tend to forbid on cross-examination such disgracing questions. Upon the general subject see 8 Ency. Pl. & Prac. 118; 1 Thomp. on Trials, s. 287; Whart. Crim. Ev. s. 472; 1 Whart. Ev. s. 541; 1 Greenl. Ev. s. 461b (c); note 21 Am. D. 59; note 88 *Id.* 321. In *Howell's Case,* 5 Grat. 664, it was held that there was no error in refusing a question put by a prisoner to a female witness who stated that she was unmarried as to how old her youngest child was, and whether she was not generally reputed to be unchaste, and whether she was not unchaste. It does not appear that the witness objected; still it was no error, because the court had a discretion to reject the question. It condemns such evidence. The same ruling is found in *Forney* v. *Ferrell,* 4 W. Va. 729. There the witness set up no objection, but the adverse counsel did. There being no objection by the witness, we see that the lower court had such discretion to refuse the question; but it would not have been error to allow it to be answered in the ab-

sence of objection by the witness. In the present case, as the witness did not claim the privilege we have to say that there is no error available to the prisoner in allowing the questions, even if answered. There is no available error in either allowing or rejecting such question, if the witness do not object. The first impression is, that where a person's material witness is discredited by such irrelevant testimony, he could complain, as the general rule is that irrelevant evidence, raising a collateral issue, is not to be allowed, and that it is error to allow it, if it may have harmed the party; but it seems to be a matter covered by the discretion of the court. Irrelevant evidence cannot be admitted on the main issue without its being cause of reversal; but this evidence is not on the main issue, which makes a difference as to the reversability of the error. The matter being personal to the witness, a party cannot except, if the witness waives his privilege to object, and it is then within the court's discretion, not a ground of error. We do not intend to say, as an inflexible doctrine, that there may not be a case of gross abuse in admitting such evidence; but such a case must be rare, indeed, under the authorities.

It may be thought that we are departing from the *Howell Case* and the *Forney Case* above, as it may be claimed that they brand such evidence as improper, and justify its rejection, and therefore it is error to admit it. I have been perplexed with this question; but do not think those cases go beyond holding that there is no error in excluding such disparaging evidence. I do not think that they mean to say the court may not, in its discretion, admit it where justice calls loudly for it. The great current of authority does allow that discretion, and we should not interpret those cases as counter to that current. If asked why, if it is no error to refuse such evidence, is it not error to admit it, I answer that when refused, the complaining party can be told that he has no right to evidence irrelevant and alien to the case; and when admitted, the complaining party can be told that the privilege to object is personal to the witness, and that such party has tendered the witness as credible, and cannot complain, if his character is put in its true light to the jury. We cannot say that the discretion of the circuit court was abused in allowing this evidence. But even if the allowance of such question in this case were error, that error is purged by the fact

that the evidence was later ruled out as above stated, the presumption being that the jury was capable of separating the illegal from the legal evidence, and based their verdict only on that properly before them. The general rule is that such withdrawal cures error, unless it very plainly appears that the evidence must have made such an impression on the jury that it could not be eradicated, *Pennsylvania Co.* v. *Roy,* 102 U. S. 451; *Throckmorton* v. *Holt,* 180 U. S. 552.

The court in the present case allowed the **State** to put to another witness, Taylor, questions touching her chastity, imputing ill fame. The witness refused to answer, as the court gave her that privilege. Hence it is not a question of whether evidence injured her oath; but whether the mere interrogation was error. We think not. If even she had answered it, being a waiver of personal privilege, the prisoner could not except, and much less can he to the mere unanswered interrogation.

A witness, Dunn, was asked by the State if he had not been in the penitentiary, and answered that he had. A witness may be discredited by showing a conviction of felony or perjury, it being a finality by record and not disputable. And Dunn having waived objection, the prisoner cannot raise the question. And that seems to me to do away with the question whether it was competent to prove that he had been in the penitentiary without the record; but at any rate, whilst the general rule of proving a record calls for its production, its details are not proposed to be proven when a witness is asked if he has been in the penitentiary, it being an isolated physical fact *dehors* the record; and whilst there is conflict of authority, it is our practice to ask a witness on cross-examination that question, and it is supported by the better law. 1 Whar. Ev. s. 567; 1 Greenl. Ev. (16 ed.) s. 461b (b).

Another point made by counsel in support of the writ of error is that the court refused to strike out the state's evidence as insufficient to convict. A demurrer to evidence does not lie in a criminal case. *State* v. *Alderton,* 50 W. Va. 101. But assuming, as held in that case and in *State* v. *Flanagan,* 48 W. Va. 115, that a motion to strike out, though generally operating as a demurrer to evidence, does lie, we must apply to it the principle applicable to such motion, that a party waives it by going on with his evidence, as the accused did in this case. Therefore

we will have to consider the sufficiency of the evidence upon the motion for a new trial. It is urged by counsel that no evidence shows the receiving of the goods with guilty knowledge in Marion County, and therefore the conviction is without jurisdiction. The general law, as also the letter of Code, chapter 145, section 18, requires that the receiving must be accompanied with knowledge by the receiver that the goods are stolen goods. This is purely a question of fact, which the jury found to exist, and we cannot invade the jury province except in a very plain case of insufficiency of evidence. There is, to say the least, some evidence, composed of a number of circumstances to prove this fact. But in addition to the facts only appearing to us in type, we must remember that the judge and jury saw the witnesses face to face, among them the prisoner, and scanned their faces as we cannot do. The goods were stolen beyond cavil, as the jury found. The accused as a witness stated that two men came to his home in Fairmont, Marion County, and one of them hired him to take some goods to the neighborhood of Pruntytown; that the man wanted a box to pack the goods in, and the accused got a store box, and took it home and put it on his premises; that he could not get a wagon and horse until nightfall, when he drove the wagon from the livery to his home, and there the two men loaded this box and another small one which they had in the wagon and about ten o'clock at night the accused and his small son set out with the wagon and the two boxes. He did not know the men. He did not ask, and they did not give their names. Neither man gave his name then, he says, but one of them gave the name "Joe Hooker" the next day; but he says he has never seen him since. He has never come to light. He says that he told the men that he would take the boxes to Nelson's near Pruntytown. He says that on the way some spokes came out of a wheel, and he was obliged to stop, and that he went to a country house, Scrannage's, in Taylor County, before day, and lay down until light, when Scrannage came out, when he told Scrannage that his wagon was disabled, and he wanted to leave the boxes with him, and did leave them in a cow shed, and returned, some 13 miles, with the wagon to Fairmont, saying he would be back some time. He says Scrannage asked him what was in the boxes, and he replied that he did not know but thought they were peddlers'

goods, and belonged to strangers. He was in the habit of buy-
ing old gum shoes, brass, etc., and asked Scrannage if he had
any to sell. Scrannage says that the accused told him that the
boxes contained old gum shoes; but this was clearly not so, as
several witnesses say that the boxes were opened while in the
cow shed and found to contain ladies and men shoes and ladies
skirts. They were identified as the same things taken from
the railroad car. When asked at Scrannage's where he had
come from he said from Pruntytown, whereas he had come, as
he and his witnesses show, from Fairmont in an opposite direc-
tion. He did not pretend that he had been at or near Prunty-
town—did not deny, but positively stated as a witness, that he
went straight from Fairmont to Scranage's. Thus, that morn-
ing he, beyond question, gave a false account of the contents of
the boxes and of the true point from which he had come. Why
did he do so but to hide the truth? And why start so late at
night as ten o'clock for a journey of twenty-one miles or more
to Nelson's, unless he wanted to hide his doings under the veil
of night? And Scrannage's was not on the road from Fair-
mont to Pruntytown. Why put those boxes in an old cow shed,
instead of asking Scrannage to let them stay a few days in his
home, where they would be safe? Perhaps he thought they
would be more exposed to observation, scrutiny and talk. Why
go to Scrannage's at all when his destination was Pruntytown?
It was out of the way. In one breath he told Scrannage that
his reason for wanting to leave the boxes was that some spokes
had come out of a wheel; in another that he wanted a bigger
wagon, when that was surely adequate for the load; in another
that the boxes jostled about. He was put to in order to explain.
Why did he not tell Scrannage that he was hauling the boxes
for hire from Fairmont to Pruntytown? Instead he told him
he had come from a little town back of Pruntytown, but could
not call its name until several were named over and he picked
out the name Webster. Was Hill not getting scared and
anxious to get the boxes out of his open possession? Why had he
not made the trip from Fairmont to Pruntytown from ten
o'clock until sun-up 19th September, when he says he reached
Scrannage's? Was he getting afraid to go to Pruntytown, and
delayed on the road? Did he, in fact, start for Pruntytown?
Why did he go out of the way, if his wagon was disabled, off

the Pruntytown pike instead of leaving the boxes at some place on that pike? And then it is strange that he would get the box, instead of these mysterious strangers themselves getting it, and they put the things in them, and he be conveniently absent while they were working at them on his premises, and he not know what was in the boxes, nor ask the men·what was in them. Did he take them away off from Fairmont to hide them? Why did he not ascertain about the men? These are only some · of ·many things in this voluminous evidence. There is much more, many circumstances,· having a connection but of tedious detail, going to criminate, bearing on the question of Hill's· knowledge that the goods were stolen, especially the long, labored story of Hill as a witness, giving minute things and conversation having no connection with the main question, evincing a strenuous effort at plausibility. His own examination tells a tale, as the jury must have thought. It is not necessary to give evidence or facts; but I have given enough to show that· there was much evidence, many facts, before the jury tending to show guilty knowledge.

On fixed principles we cannot disturb the verdict approved by the judge who saw the witnesses and considered the verdict only a true deliverance according to the evidence. The prisoner's trouble is the verdict of his countrymen. *Young* v. *Railroad,* 44 W. Va. 218; *State* v. *Bowyer,* 43 *Id.* 180; *State* v. *Cooper,* 26 *Id.* 33; Hugus' Digest 168. Especially does this rule prevail where credit of witnesses·is involved. *Akers* v. *De Witt,* 41 W. Va. 229. It seems to be thought that this Court is a jury to weigh evidence.

Another point of complaint is the admission as evidence of a manifest made by the B. & O. Railroad Company of goods in a car, showing the presence of seven boxes of shoes consigned from Baltimore to Alasker & Klaw. It is said its genuineness was not shown, as all private writings must be proven. It was proven by the railroad agent that the manifest came to him · as agent from the hands of another employee by the company's train from Baltimore in usual course of business. Does not this authenticate it? Must the Baltimore employee be brought from another state to prove its execution, and that the goods were loaded in Baltimore, and by a brakeman that they were carried to Fairmont? I think it evidence to prove those facts;

but is not needful to hold this. It was used, in connection with the evidence of witnesses only to identify the goods in the car. It was only to show that the boxes mentioned in that paper were in that car. If the witness had gone into the car and found seven boxes of Alasker & Klaw's goods in the car, and made a memorandum on a paper, it would have been the same. I do not see that this manifest performed any material function in the trial. A count in the indictment charged Hill with breaking into the car and stealing the goods, and it was designed to show that those goods were in the car when broken into. Hill is now charged only with receiving, not burglary. That the shoes were in the car was shown by the witnesses independently of the paper. As to the breaking, the carrying away, that the boxes had shoes in them, that the shoes in them had a brand on them, "Tiger Brand," and other carmarks, and that the boxes received by Hill and carried by him to Scrannage's had in them shoes bearing the same carmarks as those bought in Baltimore by Alasker & Klaw, and found in the car, all this was dependent, not on that manifest, but entirely on other evidence. Were those goods in that car alleged to have been broken? Other evidence answered.

Another point asserted to be error is that Alasker was allowed to use an invoice or bill of shoes bought by Alasker & Klaw of the Baltimore Bargain House, to refresh his memory as to what was bought there, the complaint being that he evidently spoke only from the paper, not from a refreshed memory. It is hard to see how far the mind operates from its own inherent strength or means of recollection. We cannot see any reversible error in this. It is also said that this invoice is liable to the same objection as to want of authentication as the manifest above spoken of. It was not used for proof of any thing—only to refresh memory.

In the box with the shoes of Alasker & Klaw when the box was opened at Scrannage's were found some skirts belonging to Wilson stolen from the car, and also some skirts not proven to have been stolen. Evidence was given to show these skirts were in that box, and they were exhibited in court along with the stolen articles as articles found in the box. The prisoner objected to this evidence relating to the skirts on the ground that no evidence was given to show they were stolen. How

could this evidence harm the prisoner? The State did not claim these articles to be evidence against Hill. They came in only as an inseparable part of the whole evidence of what was found in the box, as a part of the *res gestae* of the opening of the box, and were shown as part of the things found in the box. It was competent to show what all was in the box. The court only retained evidence as to their being in the box, and ruled that those articles and the evidence touching them had no operation against the defendant on the trial.

Affidavits of one Mason and his wife and one Nelson were filed as newly discovered evidence to get a new trial. These parties were witnesses on the trial, and no reason is shown why the matters to which the affidavits relate were not discovered sooner. Hill makes no affidavit to show that any diligence was used in this connection, nor does any one else. This is enough alone to answer this claim of error. But the matters are immaterial. The evidence of Mason was so unimportant that nothing relating to it as ground for a new trial based on his affidavit could effect anything. There was no import in his evidence sought to be modified as to date. These are all the points meriting any discussion, and seeing no error in them, we must affirm the judgment.

*Affirmed.*