# Richmond.

## W. Carroll Parsons v. Commonwealth.

March 13, 1930.

Absent, Hudgins, Gregory and Browning, JJ.

836

The opinion states the case.

*James E. Heath* and *Thomas H. Nottingham*, for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

W. Carroll Parsons was convicted in the Circuit Court of Northampton county upon two counts of an indictment charging him with violations of the State prohibition law (Acts 1924, chapter 407, as amended). This indictment contains three counts, namely (1) the omnibus count, (2) a count charging the unlawful manufacture of distilled ardent spirits, and (3) the omnibus count against ownership, possession, etc., of a still. Roland Foxwell was a joint defendant.

The jury's verdict was: "We, the jury, find the defendant, Roland Foxwell, not guilty on any count of the within indictment; we find the defendant, W. Carroll Parsons, guilty upon both the first and second counts of the indictment and fix his punishment upon the first count at three months in the county jail and assess upon him a fine of $250.00, and upon the second count fix his punishment at six months in the county jail and assess upon him a fine of $250.00."

Upon this verdict the court entered the following judgment: "Thereupon it is considered by the court

that the Commonwealth of Virginia recover against the defendant, W. Carroll Parsons, the sum of five hundred dollars ($500.00), the aggregate of the two fines imposed by the verdict of the jury aforesaid, and its costs by it about its prosecution in this behalf expended, and that he be confined in the county jail for a term of nine (9) months, the aggregate time imposed by the verdict of the jury aforesaid; such term of imprisonment to commence with January 23, 1929."

The first assignment of error grows out of a refusal of the trial court to grant a continuance. The petitioner makes this statement as the basis of that assignment: "Before the jury had been sworn, your petitioner and his co-defendant, one Foxwell (who, as the verdict shows, was acquitted by the jury), moved the court to continue the trial of the case until the next term of the court on the ground that the wife and son of one Custis Winder, who had been duly subpoenaed, were unable, by reason of illness, to attend court. This motion the court overruled on the ground, to quote the language of the court, that the evidence which it was admitted that these witnesses would give 'was not of that importance to warrant a continuance.' These witnesses would have testified that neither of the defendants owned the still involved in this indictment but that the same was owned by the said Custis Winder."

At the conclusion of the evidence, in response to a request on behalf of the accused, the attorney for the Commonwealth stated that he would ask for a conviction on the first and second counts, specifically for the transportation of ardent spirits and for its manufacture. There was no conviction asked for because of the ownership of the still, and none was returned. That matter was withdrawn from the jury's consideration. Had the possession of the still been in issue, this

evidence would have been very material, but it was not. Assuming that these absent witnesses would have testified as claimed, and that the jury would have believed their statement, there is still ample evidence in the record to sustain the verdict without in any wise contradicting them.

■ "A motion for a continuance is addressed to the sound, but not arbitrary, discretion of the court under all the circumstances of the case, and the appellate court will not reverse a judgment or decree because of the action of the lower court on such motion, unless the action was plainly erroneous. Abuse of discretion and prejudice to the complaining party are essential to reversal." 2 Michie's Dig. Va. & W. Va. Rep., page 855, and many cases cited.

The second assignment goes to the refusal of the court to order a mistrial.

■ The petition states: "W. H. Currie was a witness at the trial, called on behalf of the Commonwealth. Currie was the manager of a D. P. store at Eastville. It was sought to prove by this witness that your petitioner had been buying sugar at his store in large quantities; that he suddenly stopped buying there; and that, when he stopped, he gave a reason for doing so to Currie which contained damaging admissions. Currie, however, when the question, by which it was sought to elicit this information, was asked him by the Commonwealth's attorney, denied that your petitioner had given any reason at all for ceasing to deal at the D. P. store. Thereupon, the attorney for the Commonwealth, in the presence of the jury, referring to the witness' answer, said to the court:

" 'Your Honor understands the circumstances. The witness has proven to testify differently from what he has told me.' "

The record contains a more detailed account of this incident, as appears from this excerpt:

"Q. Did he give any reason for stopping buying sugar from you?

"A. No, sir; only he said that he would have to do his dealing somewhere else.

"A. No, sir, he didn't."

Mr. Quinton Nottingham: "Your Honor understands the circumstances. The witness has proven to testify differently from what he has told me."

Mr. Heath: "We object to this in the presence of the jury. We object to the statement made by the Commonwealth's attorney in the presence of the jury and ask for a mistrial on the ground of that."

The court: "Your request will be denied and the jury are instructed by the court not to pay any attention to any such statement as that."

Mr. Heath: "Will your Honor allow us an exception?"

The court: "Of course."

Mr. Quinton Nottingham: "May I take up the point in the absence of the jury?"

The court: "Of course."

Note: "The jury retired."

The court: "It occurs to the court this is a needless interruption. The rule is fairly well known to the court. It obtains not only in criminal but in civil cases and every other kind of a case that when the subpoenaing and examining counsel is taken by surprise by the answers of a witness who doesn't testify to what he had reason to expect him to testify, then he may interrogate him and treat him as an adverse witness."

Mr. Quinton Nottingham: "What I expected to show is that Mr. Currie told me that Mr. Parsons said

he would have to stop buying sugar from him unless he delivered it up in Reedtown for him. He did after that stop buying sugar from him."

The court: "I can't understand, Mr. Nottingham, how that can possibly be such a vital question. You may proceed."

Mr. Heath: "I think your Honor's ruling is absolutely correct. He has got the right by proper questions to show he is taken by surprise, but we don't think he has the right to make the statement which he did make in the presence of the jury."

The court: "The court will return your compliment and say in that statement you are absolutely right. It ought not to be made to the jury and the court has endeavored to annul or cancel whatsoever ill impressions or ill results might have ensued from it. Mr. Nottingham, you have a right to cross-examine the witness."

Mr. Nottingham: "I will withdraw it."

If there is error here, it arises out of the conduct of the attorney for the Commonwealth. All that the court did was to tell the jury to pay no attention to his objectionable statement, and in the course of the colloquy which followed counsel for the accused said: "I think your Honor's ruling is absolutely correct." Notwithstanding this commendation from Sir Hubert, complaint is now made because the court did not proceed to emphasize its direction to the jury.

A fair consideration of this incident shows that the attorney for the Commonwealth was surprised by the answer of the witness, and was proceeding to secure from the court permission to cross-examine him. It may be conceded that he did not express himself tactfully. Certainly if he were right in his premise, the liberty asked for should have been given. In affirma-

tion of its ruling already made, the court, while the jury was still absent, said to counsel: "It ought not to be made to the jury and the court has endeavored to annul or cancel whatsoever ill impressions or ill results might ensue from it."

This handsome apology appears to have been accepted at the time. The statement to the jury seems then to have been satisfactory. The question was withdrawn and the incident closed. It is true that the court refused to order a mistrial. There was no bias in this. The burden of error, if there was error, grows out of the conduct of the attorney for the Commonwealth and not out of anything which the court did.

We have recently had occasion to consider the limitations and liberties of counsel in argument. *Norfolk & W. Ry. Co.* v. *Eley*, 152 Va. 773, 148 S. E. 678; *Hardyman* v. *Commonwealth*, 153 Va. 954, 151 S. E. 286, decided January 16, 1930. Measured by the rules there laid down, which are strengthened by the statement of the court to the jury, we are of opinion that there was no error here.

■ As ancillary to this, although not assigned as independent error in any bill of exception, unless it be in the fifth hereafter to be considered, it is said that the presiding judge so frequently interfered during the taking of the testimony as to plainly indicate to the jury his belief in the guilt of the accused, and that such action on his part constitutes error, grave and prejudicial. In short, it is said that Parsons did not have that fair trial guaranteed to him as fundemental in our system of jurisprudence.

We sit as an appellate court, and it is neither our duty nor our privilege to search the record for error. When no constitutional question is involved, and when the error charged is not apparent upon the face of the

record, the point must be preserved by a proper exception taken during the course of the trial and carried into a bill or certificate of exception, or the exceptant must bring himself within the provisions of Rule of Court No. XXIV.

In *Owens* v. *Commonwealth*, 147 Va. 624, 136 S. E. 765, it is said: "The fact that counsel noted an exception to the ruling of the court does not suffice. The only method by which the ruling of the court can be called in question is by a certificate, as provided by statute or by a bill of exception.

"In Burks' Pl. & Pr. (1st ed.) 514, it is said: '*       * The noting at intervals in stenographic notes that objections to questions were made and overruled and exceptions taken, is not sufficient. There must be a bill of exception signed by the judge." See also *Lorillard Co.* v. *Clay*, 127 Va. 734, 104 S. E. 384; *Rust* v. *Flooring Co.*, 151 Va. 845, 145 S. E. 321.

This method of appellate procedure has been modified by Rule XXIV. Concretely, it is sufficient if objections, with the reasons therefor, appear in the transcript of the evidence, authenticated by the judge. They must, however, be carried into the petition for a writ of error which is the foundation of any relief which we can grant. Every road must start from somewhere.

It is true that when this is once done we may look to the record in order to gauge its relevancy and force. Its background and setting are at times valuable. An error once committed might be treated as harmless; its repetition might make it prejudicial. A straw added to others may break a camel's back, but this last straw must be put upon the camel and not upon some other bearer of burdens.

Somewhere some improper act of the judge must

be assigned as error in a proper bill. At times when this is done his conduct throughout the entire trial may be scrutinized that we may weigh its force, but we cannot do this when the bill relied upon deals not with his conduct but with that of counsel. A house must have some foundation, even if it be but sand. Errors which may be relied upon to support a common cause must be in *pari materia*. So much for well recognized rules of procedure.

The charge, however, is serious, and notwithstanding these elementary principles we shall examine in some detail those incidents now claimed to have been hurtful, even though not preserved in bills of exception. It thunders in the index, but to prevail support must be written in the record.

When Ezekiel Axall, a witness for the Commonwealth, was being cross-examined, he testified in part as follows:

"Q. You were convicted anyhow by a jury in court here, were you?

"A. Yes, sir.

"Q. Two years ago.

"A. Yes, sir.

"Q. So you have been making liquor for a long time.

"A. Not for a long time.

"Q. How far back have you been making liquor?

"A. That was the first time I made any.

"Q. When—two years?

The court: "Two years, he said. Don't let us take up time unnecessarily in cross-examination."

By Mr. Thomas H. Nottingham:

"Q. And you were given eighteen months at that time and this was the second offense you were convicted for this time?

"A. Yes, sir.

"Q. And you were given three months?

"A. Yes, sir."

■ No exception was then taken to the judge's admonition, but complaint of it is now made. This witness had just stated that his first conviction was two years ago and to immediately ask him if it was not two years ago he was first convicted, was unnecessary. The court's caution was entirely proper.

■ Later, during a further cross-examination of this witness, he was asked who killed Morris, and replied that he did not know. The court said that the question was improper. This colloquy followed:

Mr. Thomas H. Nottingham: "I was going to follow it up and show he was implicated in it."

Mr. Quinton Nottingham: "He can ask him if he was there when the man was killed."

The court: "I don't want unduly to restrict you. I realize the situation you are in. You are defending a man or a pair of men charged with a grave offense, and I want to give you every possible indulgence, but I don't want you to transgress the rule of evidence so palpably as that question, in the court's opinion, does."

Mr. Thomas H. Nottingham: "Will your Honor allow him to say whether he assisted in carrying the dead man away when he was carried from the house to the railroad track?"

The court: "The court doesn't have anything to do with it. It may tend to cast discredit upon him and for that reason the court will permit you to do it. I think the rubber band is distended to the maximum capacity when you do that. Since you brought it out I will permit you to do that."

Morris had been murdered a short time before. Some suspicion attached to the witness and he was arrested and examined, but does not appear to have

ever been indicted. The court probably thought that this question was a gratuitous attempt to discredit him, and may have been right. However, the examination was in fact permitted and no exception was taken to anything here done. Later on, this same witness was asked:

"Q. And you were brought here on that charge and examined in connection with it? (The Morris murder.)"

The court: "He already testified to that. That is useless repetition."

This was unnecessary repetition, for the witness had previously testified fully on this point during his cross-examination. On redirect examination the Commonwealth's attorney apparently was about again to go over the Morris murder, and asked the witness:

"Q. Ezekiel, along in that connection, where were you picked up when you were arrested?

"A. I was at home."

Whereupon the court observed: "Why go into that? I think his cross-examination is just about as satisfactory from your standpoint as you could expect it to be. I don't believe you can improve on it."

This matter had been fully gone into, the court was of opinion that it was not of particular importance and properly desired to put an end to it. Its observation, to the effect that the examination already made was satisfactory from the Commonwealth's standpoint, was unnecessary and might have been omitted, but it was not important and not deemed so at the time, for no exception was taken.

Edward Addison, another witness for the Commonwealth, was being examined as to Parson's general reputation. The court intervened and these questions and answers followed:

By the court:

"Q. The question he has asked you is one of the exceptions to be found in the law. Ordinarily a witness is confined in his statements to matters within his own knowledge, but when reputation is asked about, reputation means the current expression of opinion in the community in which a party lives or in which you live, not what you know but what is generally said of and concerning the defendant.

"A. I never heard anything about his reputation or anything alse before this trouble. In fact, I didn't know Mr. Parsons or Mr. Foxwell.

"Q. Until after this arrest or after this charge?

"A. I knew when Mr. Parsons started to deal with me. That is the first I ever knew him.

"Q. Your answer was as to reputation. You say you never heard anything until after this trouble. If you mean after the charge in this instance, reputation from that time subsequent is not proper because it might have been naturally the outgrowth of that arrest.

"A. I have heard—

"Q. Did you or did you not know the reputation of these defendants as violators of the prohibition law prior to the 4th of July, we will say, of last summer?

"A. No, sir; I don't think I knew it, gentlemen.

"Q. You didn't need to know them to know their reputation.

"A. No, I never heard them discussed prior to this trouble.

"Q. You are not familiar with their reputation?

"A. No, sir."

It is certain that no harm was done here. The outstanding result of the examination was to limit the testimony to the reputation of the accused prior to his

arrest in the instant case, which was certainly not hurtful. Again no objection was taken.

The accused testified on his own behalf. He stated that he was a distributor of Studebaker automobiles and also represented a soda fountain company and had sold one about a year ago to a merchant at Cape Charles, and was asked what he did with the old fountain. The court said: "I take it for granted that the purpose of this testimony is to show the pre-occupation of this defendant during the period of his involvement in the Commonwealth's evidence. To do that you don't need to go into these infinite details."

The witness then went on to state that he had used copper gotten from Richmond to repair this fountain. His counsel was preparing to question him further as to it when the court observed: "Maybe he put it in the creek at Cape Charles. That doesn't make a particle of difference. I am entirely desirous that you have every opportunity to show his pre-occupation and what he did with the copper."

Unquestionably this observation displays a certain amount of impatience. It is to be regretted, but judges continue to be men, and it is not possible for them at all times to entirely conceal this very human quality. If we were to reverse cases whenever it is present, few judgments in drawn out litigations would stand.

In the course of Parsons' examination he was asked by his counsel:

"Q. It has been testified to by Mr. Ed. Addison that you ordered or bought one or two lots of sugar and rye from him and ordered it sent?"

Whereupon the court said: "There is no testimony of that sort. The testimony was that he bought it from him repeatedly, not one or two times."

Mr. Sacks (Counsel): "He said he couldn't tell how many times."

The court: "You said one or two times. . You are the first witness to testify to that. That isn't fair examination, sir."

Mr. Sacks did not remember with accuracy Addison's evidence. The court corrected him, as it had a right to do. Specific objection is made to the use by the court of "repeatedly," but it was justified by the record.

■ Again, during the course of Parsons' cross-examination, the Commonwealth undertook to show that he had employed counsel to defend Winder upon a charge of violating the prohibition law, in the operation of the still in evidence here. Objection was made to this on the ground that it required the disclosure of a confidential communication made by the accused to counsel.

Mr. Parsons was not called upon to disclose anything which he had said to his own counsel but merely to state if he had retained some lawyer to represent another man, all of which was plainly proper in cross-examination. No complaint is made of misconduct on the part of the presiding judge, and so we cannot tack on to it, and as a necessary part thereof, other acts and rulings now claimed to have been hurtful.

Another phase of the examination of this witness on this point is carried into the fifth bill of exceptions. It substantially charges bias on the part of the presiding judge. The attorney for the Commonwealth asked the witness:

"Q. Will you tell this jury who employed Mr. Dickinson to represent Cut Winder when he was charged—."

Before the question could be completed an objection was interposed and the jury was requested to retire that it might be argued in their absence, at the

conclusion of which the court said: "I think, under the state of evidence, that it is entirely permissible that this witness should be asked the question as to whether or not he did not employ counsel to defend Cut Winder upon the charge of operating this still."

The jury then returned, and this occurred in its presence:

The court: "Ask him the direct question, did you or did you not employ a member of the Northampton Bar to defend Cut Winder upon the charge of violating the prohibition law in the operation of the still referred to in the evidence taken in this case."

"A. When I went in—."

By the court:

"Q. Answer the question, Mr. Witness. Did you or did you not?"

Mr. Heath: "May we object to the—."

The court: "You may continue to object Mr. Heath, but the Commonwealth's counsel is entitled in a question such as he has been asked to an affirmative answer. Then he can give any explanation."

Mr. Heath: "May I object to all the statements that the court has made, expecially to it telling this witness that he must answer yes or no?"

The court: "Indeed you may."

Mr. Heath: "We note an exception, if your Honor please."

By the court:

"Q. Answer the question, did you or did you not employ Northampton counsel to defend Cut Winder in this case—yes or no?

"A. No, did not employ him myself.

"Q. If you desire to make any explanation, you are at liberty to make it."

Mr. Heath: "I have no explanation to make."

The court: "I am not talking to you; I am talking to the witness."

Mr. Heath: "You were looking at me and I thought you were speaking to me."

"A. Cut Winder asked me would I send Mr. Sacks in to represent him. In the presence of Mr. Sacks I went in to see Cut Winder and Mr. Sacks told him being interested in the case, or some words to that effect, that he could not represent him and he asked me would I lend him the money to represent him, so I told Mr. Dickinson to go in there and while I was in jail Mr. Sacks was in there when I was talking to Cut Winder."

█ █ The use by the court of the expression "affirmative answer," disassociated from its context, might have been hurtful, but as used it could not possibly have misled anyone. Plainly the court intended to tell the witness that he must answer yes or no, and it is equally plain that his counsel so understood. With this out of the way, all that the court did was to say that the witness must answer directly whether he had or had not employed counsel to defend Winder, and at the same time said to him that he might add any explanation which he desired to add. We are unable to see how bias can be deduced from anything that was done here. The burden of the objection is that the witness is required to answer yes or no. After all, our judgment must rest upon some error saved. When this has been done, we may in its consideration look to the record, not for other independent errors, but for other errors of a like kind which may serve to accentuate or fortify that preserved and established, but it is essential that some error in the first instance be shown in order that others may be tacked on to it. A halter, to hold, must be hitched to something. Here there was no initial error.

Other incidents are referred to, sixteen in all, as showing bias, but neither in those considered nor in those to which naked reference has been made is there any suggestion of any exception, save in bill numbered 5, and so for reasons stated they cannot be treated as independent sources of error, but only to accentuate some assignment well taken which appears somewhere.

The duties and limitations resting upon trial judges have recently been considered by this court in *Nelson* v. *Commonwealth,* 153 Va. 909, 150 S. E. 407, and it is not necessary to restate here what was said there. From that opinion it is plain that we are in no wise prepared to extend the rule laid down in *Mazer* v. *Commonwealth,* 142 Va. 649, 128 S. E. 514. Trial judges, in Virginia, do not sit merely to keep order. They must do whatever seems to be necessary to mete out evenhanded justice, both to the Commonwealth and to the accused, and they should with care abstain from conduct which tends to indicate to the jury any opinion upon those facts, which it is their, and not his, duty to pass upon. We further think that in the case in judgment the court took a more active part in the examination of witnesses than is desirable, and some of his remarks might have been left unsaid. Had exceptions been taken to all that was done we would still be of opinion that reversible error has not been shown. Cases should not be reversed merely because the judge was impatient, or because he of his own motion ruled out improper testimony and objected to unnecessary repetition; even tilts with counsel are not sufficient.

No trial is perfect, and error will at times creep in, particularly in hotly contested cases. To warrant a reversal it must be substantial; otherwise litigation

would be interminable. *Agostini* v. *Commonwealth,* 136 Va. 658, 116 S. E. 384; *Oliver* v. *Commonwealth,* 151 Va. 541, 145 S. E. 307.

It follows that the matters complained of do not constitute reversible error, and for two reasons: They were not properly preserved in any bills of exception and they are not substantively sufficient.

The jury found Parsons guilty on two counts. On the first it fixed his punishment at three months in jail and a fine of $250.00; on the second the verdict was six months in jail and a fine of $250.00. The court added these two fines together, as it did the periods of confinement, and sentenced Parsons to nine months in jail and a fine of $500.00. He did not suffer because the verdict was thus dealt with. Code, section 4786; *Commonwealth* v. *Leath,* 1 Va. Cas. (3 Va.) 151.

There are no reversible errors in the record. The judgment of the trial court is affirmed.

*Affirmed.*