STATE OF WEST VIRGINIA

*v.*

DENNIS JUSTICE

(No. 10317)

Submitted April 24, 1951.   Decided May 22, 1951.

*M. O. Litz, Capehart & Miller, H. D. Rollins,* for plaintiff in error.

*William C. Marland,* Attorney General, *George W. Stokes,* Assistant Attorney General, for defendant in error.

GIVEN, JUDGE:

The defendant, Dennis Justice, was indicted at the January, 1949, term of the Criminal Court of McDowell County for the murder of Thomas Whitt. The Circuit Court of McDowell County refused a writ of error to the judgment of the Criminal Court of that county, sentencing the defendant to imprisonment in the State penitentiary for an indeterminate period of not less than five years and not more than eighteen years.

The homicide occurred on the 6th day of November, 1948, about 4:00 P.M. at Panther, near the southern end of the bridge crossing Tug River. Apparently the deceased, Thomas Whitt, and his brother, Curtis Whitt, had driven their passenger automobile to that point some

fifteen to thirty minutes prior to the arrival there of the defendant and his father, Matt Justice, in a truck being driven by defendant. Immediately after the arrival of the truck the defendant and his father got out of the truck, each with a thirty-eight caliber pistol in hand, defendant going around the front end of the Whitt automobile and Matt Justice going around the rear thereof. Both immediately started shooting at the Whitt brothers, defendant shooting at Thomas Whitt, and his father shooting at Curtis Whitt. Both of the Whitts were killed. After the shooting was over the pistol used by defendant was found to contain one loaded and five empty shells, and the pistol used by Matt Justice was found to contain two empty and four loaded shells. It is clear that Thomas Whitt died from the gunshot wounds inflicted by defendant. Matt Justice was convicted of voluntary manslaughter in connection with the death of Curtis Whitt.

The Whitt brothers and the Justices were long time acquaintances, and lived in the general vicinity of Panther. Apparently no serious difficulty had previously existed between them. There was some evidence to the effect that the Whitt brothers, a few days prior to the homicide, had "some trouble" with Zeb Justice, a brother of Matt Justice, and that the Whitt brothers believed Matt Justice would seek revenge against them. There is no evidence, however, that Matt Justice or the defendant intended to do so. About ten-thirty or eleven o'clock on the morning of the homicide the Whitt brothers drove their automobile near the home of Matt Justice, requested him to come to the road, called him a vile name, and, according to the testimony of Matt Justice, "Curtis throwed a gun on" him and stated " 'I am going to shoot you in two' ". Matt Justice did not go to the road. The Whitt brothers drove farther down the road and fired a gun toward the residence of Matt Justice Later in the day one of the Whitt brothers fired a gun near the home of a daughter of Matt Justice, near the place where the homicide occurred. The daughter notified officers of the actions of the Whitt brothers.

Defendant, twenty-three years of age, lived with his father, but was not at home at the time the Whitt brothers threatened his father. Later in the day, however, he and his father drove a truck to Iaeger for the purpose of purchasing feed and groceries. They went into the White Front Cafe, ordered beer, but left the cafe without drinking the beer after discovering that the Whitt brothers were in a booth in the cafe. After leaving the cafe they drove to a feed store, made purchases, and apparently delivered some rugs, at the request of the feed store proprietor. The movements of the Whitt brothers can not be definitely traced after they left the cafe. They were at a gasoline service station some little time before the homicide, and the station attendant saw two shotguns in the rear of their automobile. Other witnesses saw the two guns in the Whitt automobile on the day of the homicide. There was some contention to the effect that the guns were intended to be used for squirrel hunting. Herbert Brunty, a witness for defendant, was asked the following question and answered: "Did you have a conversation with Thomas Whitt on that occasion with reference to Matt Justice? A. He asked me if I had heard the latest. I said, 'No, I reckon not. What about it?' He said, 'About Zeb Justice getting beat up,' and I said, 'He did?' He said, 'Yes.' 'Well,' I said, 'do you think it is over?' 'Well,' he said, 'I don't know, we may have to kill old Matt before it is over.' " There is some evidence to the effect that the reputation of Thomas Whitt was bad, and considerable evidence to the effect that the reputation of Curtis Whitt was bad. Some threats made by the Whitts were apparently communicated to the defendant and his father.

There were a number of witnesses who saw the shooting, or part of it. Some of them testified for the State, and some for the defendant. According to the evidence of the State, at the time the truck driven by defendant stopped at the scene of the homicide, Thomas Whitt, Curtis Whitt and a Thomas Justice were standing on the right side of the Whitt automobile, a Tudor sedan. De-

fendant got out of the truck with a pistol in his hand and immediately shot at Thomas Whitt, exclaiming: "Oh, yes, God damn you, we've got you." He then fired another shot at Thomas Whitt and, after Thomas Whitt fell to the ground, reached into the Whitt automobile, picked up a shotgun, beat Thomas Whitt over the head with it, then went around the Whitt automobile and beat Curtis Whitt over the head with the gun, after Curtis Whitt had been shot by Matt Justice. The two shotguns were lying on the ground near the Whitt automobile immediately after the shooting. They were broken down and neither had been fired. They were loaded, and there were found in the pockets of Thomas Whitt other loaded shells. The stock of one of the guns appeared to have been recently broken.

Evidence of defendant is quite contradictory to that of the State. He contends that the Whitt brothers were lying in wait for him and his father; that as soon as they recognized the truck driven by defendant they ran to their automobile; that each got a shotgun therefrom and was attempting to shoot the defendant and his father when they got out of the truck. John Church, who arrived with the Justices in the truck, riding between them, testified that the Whitt "boys got out of this car with guns or sticks I couldn't state which it was." Then this witness was asked this question, to which he answered: "What was said there between Matt and Dennis at that time? A. Well, the first word that was said, as I understood, Matt said, 'Dennis stop this truck.' Well, he went on maybe four or five feet it seemed to me and he said, 'Dennis, I told you to stop this truck.' Dennis said 'All right, daddy, I am stopping it.' I said, 'Wat's the matter?' I was the one that spoke then, I said, 'Whats the matter?' It kinda shocked me. He said, 'That's the Whitt boys,' he said. 'Did you see them jumping out with their guns.' I said, 'Yes, it was something.' He said, 'It is us or them.' I said, 'Maybe not.' Then he stepped out on the right and Dennis got out on the left and I bowed my head over." Mrs. Raymond Johnson, daughter of Matt Justice, look-

ing out of a window of her home near the scene of the shooting, testified that "* * * I saw Curtis with the gun throwed up in my father's face and when he done that I broke and run."

The defendant testified that he drove the truck to the end of the Panther bridge intending to stop for the purpose of permitting John Church to get out of the truck at that point, and when asked as to what he saw "so far as the actions of the Whitt brothers were concerned," answered: "Well, the first thing, I was talking with John, some conversation, I don't remember what it was, and I noticed the boys in the car, shuffling around in the car, and when I got a little bit closer I could see them going back out of the car and could see the muzzle of a gun through the glass as they went out; so I intended stopping anyway and then I had to stop more suddenly than what I intended to. 'Gainst I could stop the boys were both on the ground. Curtis was coming toward the rear of the car, just dropped his shoulder to see through the glass, and Thomas, he was standing on the opposite side of the wheel on the right hand side with the door open and he was down, you could see the gun up in that position over the top, looking through the window and over the wheel of the car and you could see so much of the gun barrel." He also testified to the effect that he believed his life and the life of his father were in danger, and that, at the time he stopped the truck, the Whitt "boys were on the ground with their guns", and that "they were getting in position to shoot, they had them (the guns) in their hands like this. You could see them back behind the car there just as I was getting stopped." The father gave a similar version of the affair.

A view of the scene where the homicide occurred was had by the jury. Officers and others who were at the scene immediately after the shooting and before any change occurred, placed the Whitt automboile, the Justice truck and objects representing the bodies of the Whitt brothers, the shotguns, and the blood spots, at the scene,

as near as could be, from recollections and measurements previously taken, for the jury. There were pointed out to the jury the locations of the Panther bridge, the Greenbrier bridge, the home of Mrs. Johnson and other objects believed pertinent.

Sufficient parts of the evidence have been detailed, we believe, to afford a clear understanding of the nature thereof and of the contentions of the State and the defendant. No contention is made, and we think none could seriously be made, as to the insufficiency of the evidence to support the verdict in any material respect. The trial court gave unto the jury all instructions requested by defendant, eighteen in number, except a peremptory instruction. It gave one instruction at the request of the State. No contention is here made that the giving thereof constituted prejudicial error, and we are of the opinion that the giving thereof was proper.

The defendant, in his petition for writ of error to this Court, assigned a number of grounds of error, but has assigned only three in his brief. We have examined the grounds assigned in the petition which were not briefed, and are of the opinion that none constitute prejudicial error. The first assignment of error briefed by defendant is: "It was error for the private counsel to elicit from Kathleen Hunt, principal witness for the State the statement she had made to Trooper Sine of the Department of Public Safety."

Kathleen Hunt, aged fourteen years, a witness for the State, testified fully as to the action of defendant at the time of the shooting. Upon re-direct examination she was asked: "Did you or not tell Trooper Sine and make the same statement to him you have made today?" to which she answered "Yes, sir." Thereupon counsel for defendant objected to the question and counsel for the State announced "I will withdraw the question." No motion was made by counsel for defendant to strike the answer or to instruct the jury not to consider it, and the court did not announce that the objection was sus-

tained. Defendant contends that the question and answer amounted to a corroboration of the testimony of the witness by a self serving statement made out of Court, citing *State v. Dean*, 134, W. Va. 257, 58 S. E. 2d 860. The rule referred to, though well established, does not control in the circumstances of this case. The question was promptly withdrawn upon objection being made thereto, and no further effort was made on the part of defendant to have any possible adverse effect eradicated from the minds of the jury. Apparently all then believed that no adverse effect to defendant's cause had resulted. The question was not one which would probably prejudice the minds of the jury, as was the case in *State v. Foley*, 128 W. Va. 166, 35 S. E. 2d 854, or in *State v. Burnette*, 118 W. Va. 501, 190 S. E. 905. Moreover, there was no attempt to show in what manner the defendant could have been prejudiced. In *State v. Corey*, 114 W. Va. 118, 171 S. E. 114, this Court held, Point 3, syllabus: "A verdict of guilty in a criminal case will not be reversed here because of error committed by the trial court, unless that error is prejudicial to the accused." *State v. Rush*, 108 W. Va. 254, 150 S. E. 740; *State v. Taylor*, 130 W. Va. 74, 42 S. E. 2d 549. A different situation would probably exist in the instant case had the defendant moved the court to strike the question or answer and the court had refused to do so.

The second assignment of error briefed by defendant is: "The court improperly restricted the cross-examination of Kathleen Hunt the principal alleged eye-witness for the State, and in so doing voiced his approval of her evidence in chief." The evidence given by Kathleen Hunt was deemed very damaging to the defense and she was cross-examined very extensively by counsel for defendant in an effort to discredit her testimony. On direct examination she testified that she had traveled "about thirty-five or forty feet" after she had talked with Thomas Whitt and Curtis Whitt immediately before the shooting. As above pointed out, the shooting occurred near the southern end of the Panther bridge. A bridge known

as the Greenbrier bridge is situated approximately three hundred fifty feet from the Panther bridge. On cross-examination this witness was asked and answered as follows: "Tell the jury how close you were to the place where the shooting occurred? A. About thirty-five or forty feet. Q. Do you know where the bridge is that goes across Greenbrier Creek? A. Yes, sir. Q. How close were you to that bridge? A. About ten or fifteen feet I guess. Q. About ten or fifteen feet? A. Yes, sir. Q. And yet you have just testified that you were only thirty-five feet from the shooting? A. Yes, sir. Q. Don't you know that bridge is over 300 feet from the place of the shooting? A. No, sir. Q. You don't know that, how long have you lived there? A. About five years I guess. Q. Now, on which side of that bridge were you near, were you near the side of the bridge standing facing up toward the shooting? A. I was right up from the bridge. Q. How's that? A. I was right up from the bridge. Q. You were right in front, were you in front of the center of the bridge, about ten feet from the center of the bridge, or about ten feet *ten feet* from the left-hand side of the bridge or about ten feet from the righthand side of the bridge facing where the shooting occurred? A. I was about ten or fifteen feet from the right of the bridge. Q. And you tell the jury you were only 35 or 40 feet from the shooting? A. Yes, sir." Upon re-cross examination the record shows the following: "Q. Now, Miss Kathleen, just one more question. In response to a question of Judge Howard's awhile ago I believe you answered that you could see these people, Matt Justice, get out of that truck? The State, by counsel, objected to the foregoing question for the reason that it has been asked three or four times. Q. Didn't you testify awhile ago that this car of the Whitts was in front of that truck? A. The truck was pulled back behind it. Q. How's that? A. The truck was pulled in behind it. Q. And you testified you were on the right hand side of that bridge? A. Yes, sir. Q. Within ten or fifteen feet of the bridge over Greenbrier? A. Yes, sir. Q. As a matter of fact, wouldn't you have been at least 250 feet away from this

truck if you were standing where you said you were? The State, by counsel, objected to the foregoing question for the reason that it has been asked several times. By the Court: I will sustain the objection. She testified that she was thirty-five or forty feet away. By Mr. Capehart: I am asking her on cross examination if it is not a matter of fact that if she was standing from ten to fifteen feet from the bridge over Greenbrier, if she was not at least 250 feet away from the place of the shooting? By the Court: The objection will be sustained. You asked that on your previous cross examination. Kathleen, do you know whether that picture was taken from the bridge or not? By the Witness: No, sir. To which action and ruling of the Court, the defendant, by counsel, at the time excepted."

This Court has frequently had occasion to point out that the right of the defendant in a criminal trial to cross-examine a witness testifying against him is not a mere privilege, but an absolute right. It is conceived as an instrument not only for the benefit of a defendant but for the protection of the innocent and the promotion of justice. It is the most effective method known of testing the accuracy and truthfulness of statements of witnesses. It exists not merely for the benefit of the defendant but for the State as well. A denial or abuse of the right can not be tolerated. Without the right, justice, as we know it, could not exist. Of necessity the exercise of the right must be subject to certain restrictions and limitations. Between the guaranteed right and the extent of the restrictions and limitations of the exercise thereof lies a broad field of cases which of necessity must be governed by sound and wise discretion of a trial court. The instant case falls within that field. The right was not denied defendant. The extent thereof was not too restricted or unduly limited. The very matter objected to was covered in previous cross-examination of the witness, though in somewhat different form. No reason appears why the witness should have been subjected to a re-cross examination as to the same matter. The trial

court could have properly considered these matters, as well as the age, demeanor, attitude and intelligence of the witness in passing upon the objection.

Neither do we find any merit in the contention that the statement of the trial judge "I will sustain the objection. She has testified that she was thirty-five or forty feet away", amounted to an approval of her evidence in chief. The statement of the court merely informed the parties of the basis of the court's action in sustaining the objection. It was undoubtedly intended to be and was for the benefit of the defendant. Had the court been in error as to the basis of its ruling, the defendant would then have had the opportunity to have had the matter reconsidered by the court. We are not unmindful of the rule laid down in *Ball* v. *Wilson,* 98 W. Va. 211, 127 S. E. 22, that "The law is peculiarly jealous of any encroachment by a trial court on the province of the jury, who are the exclusive judges of the weight to be attached to the evidence of any witness, and it is error for a court in the trial of the case to intimate any opinion in reference to matters of fact which might in any degree influence the verdict." See *State* v. *Austin,* 93 W. Va. 704, 117 S. E. 607; *State* v. *Kerns,* 47 W. Va. 266, 34 S. E. 734; *State* v. *Thompson,* 21 W.Va. 741. But, as already pointed out, we are of the opinion that the statement of the trial judge in the instant case did not indicate any approval of or belief in the truth or accuracy of the statement of the witness. In *Parsons* v. *Commonwealth,* 154 Va. 832, 152 S. E. 547, the Court considered a similar assignment of error, concerning a statement of a trial judge believed to have been far more objectionable than the one complained of here, and pointed out that "Unquestionably this observation displays a certain amount of impatience. It is to be regretted, but judges continue to be men, and it is not possible for them at all times to entirely conceal this very human quality. If we were to reverse cases whenever it is present, few judgments in drawn-out litigations would stand."

The only other assignment of error briefed is: "After

Matt Justice, a witness for the defendant, was compelled to admit on cross-examination that he was under life sentence to the penitentiary, .the court erred in refusing to permit counsel for the defendant to show that the crime for which Matt Justice was convicted was voluntary manslaughter for the death of Curtis Whitt." Matt Justice, father of defendant, on cross-examination, over objection of the defendant, was required to answer questions showing that on the 12th day of December, 1927, he was convicted of a charge of murder and served a sentence of twelve years in the State penitentiary therefor; that in the month of April, 1928, he was convicted of a felony in the United States District Court for the Southern District of West Virginia, and sentenced to a term of six years in a federal penitentiary. He was then asked the following question: "I will ask you if in April, 1949, Term of the Criminal Court of McDowell County, West Virginia, you were convicted as a habitual criminal and are now under sentence of life imprisonment in the penitentiary of this State?" His answer was "Yes, sir." Thereafter defendant offered to prove that the witness was convicted of voluntary manslaughter of Curtis Whitt. It has long been the holding of this Court that "Where the cross-examination relates to a recent transaction or conviction 'bearing directly upon the present character and moral principles of the witness, and therefore essential to the due estimation of his testimony by the jury' (1 Greenleaf on Ev., 15th Ed., sec. 459), the court may permit the inquiry, within reasonable limits. Necessarily, this must rest largely in the sound discretion of the trial judge." *State* v. *Price,* 113 W. Va. 326, 167 S. E. 862. See *State* v. *Hill,* 52 W. Va. 296, 43 S. E. 160; *State* v. *Worthington,* 109 W. Va. 449, 155 S. E. 313; *State* v. *Crummit,* 123 W. Va. 36, 13 S. E. 2d 757; *State* v. *Lucas,* 129 W. Va. 324, 40 S. E. 2d 817. Here, however, the only contention appears to be that the question and answer just quoted created in the minds of the jury the impression that the life sentence resulted from a conviction on the charge of murder of Curtis Whitt. We are of the opinion that there is no substantial merit in the

contention. The question propounded related only to the prior conviction "as a habitual criminal", and it was not necessary or material to show the exact nature of the prior conviction. The jury could not have been prejudiced, for undoubtedly they knew the meaning of an "habitual criminal" conviction. Moreover, the guilt of Matt Justice in connection with the killing of the two Whitt brothers should not have been permitted to influence the jury in the determination of the guilt, or the degree thereof, as to Dennis Justice, notwithstanding there was evidence tending to show that the actions of the two Justices in connection with the killings were joint and coordinated.

Finding no prejudicial error in the trial of defendant, the judgments of the Circuit Court of McDowell County and the Criminal Court of that county are affirmed.

*Affirmed.*