106 N.J. Super. 135 (1969)
254 A.2d 337
STATE OF NEW JERSEY, PLAINTIFF,
v.
KENNETH DONALD ROUNTREE, DEFENDANT.
Superior Court of New Jersey, Middlesex County Court, Law Division  Criminal.
Decided June 16, 1969.
*137 Miss Cynthia M. Jacob, Assistant Deputy Public Defender, for defendant (Mr. C. Judson Hamlin, Deputy Public Defender, attorney).
*138 Mr. David J. Monyek, Assistant Prosecutor, for plaintiff (Mr. Edward J. Dolan, Middlesex County Prosecutor, attorney).
MORRIS, J.C.C.
Motion to dismiss indictment.
This is a pretrial motion by defendant Kenneth D. Rountree to dismiss an indictment charging him with having committed five violations of the law pertaining to the possession and sale of narcotics (N.J.S.A. 24:18-4 and N.J.S.A. 24:18-47). More specifically, he is accused of unlawful possession and sale of heroin on June 25, 1968, aiding and abetting one William Towns in making a sale of heroin on August 13, 1968, and unlawful possession and sale of heroin on August 28, 1968. However, his arrest did not take place until October 31, 1968, some four months after the first alleged occurrence and approximately two months after the last.
Defendant contends that he was denied due process of law under the Fourteenth Amendment to the Constitution of the United States because the time lapse between the dates of the alleged offenses and his subsequent arrest constituted delay infringing upon his ability to defend himself. It is further urged that the delay in swearing out a complaint against him denied to him the effective assistance of counsel under the Sixth Amendment to the Federal Constitution.
Defendant presents himself as one who is almost completely frustrated in the preparation of a defense to the charges by reason of his utter inability to recall the events of any of the days in question. According to his direct testimony as I understand it, defendant is unable to recall whether he possessed heroin on June 25, 1968 or August 28, 1968, whether he sold heroin on either or both of these dates, or whether he aided or abetted William Towns in making a sale of heroin on August 13, 1968. He is likewise unable to recall whether on the days in question he was present at the several locations where the offenses are said to have occurred. The direct and *139 efficient cause of this failure of recollection is said to be the time lag between the dates of the offenses and the date on which the charges were filed, a period during which defendant had no knowledge or even an intimation that he was going to be accused.
Defendant is 21 years old. He was born and raised in New Brunswick. He completed the ninth grade in school, dropping out upon reaching his 16th birthday. His one steady job was with the Ford Motor Company from December 1966 through November 1967. Since then his employment has been sporadic, somewhat menial in nature and, in terms of total time, amounts to but a couple of months. He married on July 7, 1967.
While defendant displayed some reluctance to admit addiction, he stated that he was a heroin user before and during June and August of 1968. He said that he was "shooting up" from five to seven times each week. He conceded the possibility of his being in all but one of the locations at or near which the offenses are said to have occurred, either because of their proximity to the home of his parents whom he customarily visited on the average of twice each week or because some of the places were at or near bars or pool halls where he frequently socialized.
Defendant described his efforts to reconstruct his activities following his October 31 arrest. He said that a canvass of his wife, his parents, his friends, his co-defendants, and some 20 to 30 other people has proved unavailing. The universal problem seems to be that too much time had elapsed for anyone to remember any particulars relating to the events of the days in question.
Cross-examination, although extensive, did little to refresh defendant's recollection. Neither can it fairly be said that it demonstrated that defendant's failure of recollection is feigned. It did, however, tend to illustrate in greater detail the unstructured nature of defendant's existence. For some time he has been more or less aimlessly drifting along through life without discernable purpose or goal. Although styling *140 himself as a devoted husband and homebody as well as a dutiful son, it is apparent that his frequent habit has been to spend considerable time in the downtown area of New Brunswick visiting various bars and pool halls at or near which some of the offenses charged are said to have occurred. He conceded that on various dates he may have seen or been in contact with certain other alleged narcotics offenders in such places as Louie's Bar, the Marine Bar, the Golden Nugget and the New Brunswick Recreation.
Defendant's ability to recall many other past events was amply demonstrated. However, these were the sort of things a person would ordinarily be likely to remember without difficulty. For example, his recollections of family birthdays, holidays, and the like were clear. He also remembered well the occasion of a prior arrest which occurred on his wife's birthday From this, however, it does not follow that he would necessarily be able to recall the events of June 25, August 13 and August 28, when he was arrested on October 31.
It is my conclusion, based upon what defendant had to say, how he said it and his demeanor generally, that he does not, in fact, presently recall the events of the days in question. Plainly, he does not deny that at various times during the general period he actually possessed heroin, for he admits being an almost daily user. Neither does he actually deny that he ever sold heroin or that he may have aided or abetted Towns in a sale. His problem is that absent recollection he cannot be certain of his guilt or innocence of the specific acts charged. Absent recollection he does not know whether he may have an alibi or other defense as to these particular charges. Absent recollection he cannot properly assist his attorney in the effective preparation of his case. All of this is alleged to be the product of what is claimed to be the unwarranted delay on the part of the police in swearing out the complaints against him.
The charges against this defendant stem from an undercover investigation conducted in the New Brunswick area by the New Jersey State Police which ran from May or June *141 1968, through October 31, 1968. It appears that Investigator Victor Irizarry, operating under the supervision of Detective Frank La Citra, undertook to infiltrate the world of narcotics users and sellers by "making the scene" on a daily baisis with persons suspected of being involved in this type of activity. His technique was to pose as a "junkie" himself, gain the confidence of other "junkies," find out who was supplying narcotics locally, make "buys" from the sellers or "pushers," and to assemble as much evidence as possible against as many offenders as possible to the end that a telling blow might be delivered to the whole local narcotics set-up in one fell swoop. The fell swoop in the case eventuated during the early morning hours of October 31 when approximately 50 suspects were rounded up by state, county and local police acting in concert.
A tabulation of the subsequent indictments reveals that 174 charges were made against 47 individuals. The pattern of the undercover agent's activity is reflected somewhat by an analysis of the dates of the alleged offenses. It appears that 10 are said to have occurred in June, 32 in July, 54 in August, 47 in September, and 31 in October. Further insight is obtained by examining the pattern of repetitive counts. Analysis reveals none in June, 12 in July, 23 in August, 29 in September, and 23 in October.
Detective La Citra testified for the State. He has been a member of the State Police for 17 years. He has specialized in narcotics investigations since 1961, originally as an undercover agent. He has been associated with literally thousands of investigations. During 1968 he was involved in over 800 narcotics matters. He explained that the nature of the traffic in narcotics is such that the method employed in this investigation is necessary to the effective detection and prosecution of such offenses. The delay in signing complaints and making arrests is not the result of any desire on the part of the police to violate any defendant's constitutional rights. The reason is that once a complaint is signed the agent's cover is "blown," that is, his identity becomes known *142 to other users and sellers, thereby terminating his effectiveness and thus bringing a particular investigation to an abrupt conclusion. Unless disclosure is withheld until the pattern and scope of the narcotics activity in a given area is fully probed, that investigation comes to an untimely close. Moreover, in a practical sense, there is a substantial waste because of the time and effort necessarily expended by an agent in achieving acceptance by traffickers in narcotics.
According to Detective La Citra the length of a given undercover narcotics investigation depends upon a number of circumstances, but in his experience investigations usually last from four months to about one year. Among the factors to be considered in deciding when to terminate he cited the evaluation of how things were going in the field, the volume of the flow of narcotics, the number of people active in the illegal activity in the given area, whether new contracts were being made, whether it appeared that prospects were good for reaching sources of supply, whether the flow of information was good and, in short, on the basis of the total picture as it appeared to exist to the officer in charge. He conceded the difficulty in determining empirically when the end had been reached, but acknowledged that a particular investigation reached its peak when the "buys" became more and more repetitive from the same individuals and the number of new offenders being contacted dropped off. He expressed the view, however, that some repeat buys from the same individual were desirable in that this demonstrated that a given defendant was a "pusher." Needless to say, the investigation is aimed more at the "pushers" than the addicts. He expressed his opinion that the appropriate termination point was reached for this investigation in October.
It appears that our own appellate courts have not had occasion to deal with this precise problem. However, in Washington, D.C., a series of reported cases have emerged as a result of undercover police activity in the sphere of narcotics detection. It is upon the basis of these authorities that defendant seeks to have the indictment dismissed.
*143 Although the State here suggests otherwise, it is clear that an issue of this kind can no longer be resolved in simple terms of the applicable statute of limitations, as appears to have been done in Nickens v. United States, 116 U.S. App. D C. 338, 323 F.2d 808 (1963). In a concurring opinion, Judge Wright sounded the tocsin with particular relation to the special problem of avoiding violation of Sixth Amendment rights of persons who are subjects of undercover narcotics investigations. He acknowledged that while ordinarily mere delay in presenting a charge will rarely work a deprivation of this constitutional right, where the delay is purposeful or oppressive an indictment obtained within the period of the statute of limitations may nonetheless come too late to square with the Sixth Amendment, citing Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957); Mann v. United States, 113 U.S. App. D.C. 27, 29-30, n. 4, 304 F.2d 394, 396-397, n. 4 (1962), certiorari denied, 371 U.S. 896, 83 S.Ct. 194, 9 L.Ed.2d 127 (1962); United States v. Provoo, 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955), affirming mem. Petition of Provoo, 17 F.R.D. 183 (D. Md. 1955), and Taylor v. United States, 99 U.S. App. D.C. 183, 238 F.2d 259 (1956).
What has perhaps proved to be the leading case, and one upon which defendant places substantial reliance, is Ross v. United States, 121 U.S. App. D.C. 233, 349 F.2d 210 (1965). There the Circuit Court of Appeals reversed a conviction for a narcotics violation on the ground of denial of due process because the defendant was unable to defend himself where the complaint against him was not sworn out until seven months after the alleged offense and, apart from the narcotics, the prosecution's case consisted solely of one undercover policeman's uncorroborated testimony of a single sale to him based upon a recollection which depended entirely upon reference to his notebook, and defendant was unable to recall the events of the day of the offense.
In reaching this result the court recognized the substantial public interest in effective police work to detect violations of *144 narcotics laws and the validity of undercover investigations to accomplish this. It was conceded that an undercover agent could not continue to be effective once it became known that he was an agent, a fact which would become widely known immediately upon his swearing out the first complaint. There fore, some purposeful delay between the offense and the arrest is inevitable and hence to a degree acceptable. The rub comes when the delay reaches such a proportion that the ability of a defendant to defend is materially affected. This requires a striking of a balance between the competing interests of society and the individual if one or the other is not to be sacrificed completely.
The result in Ross was posited upon three factors: first, the length of the purposeful delay; second, the basis of the identification of defendant, and third, the effect of the delay upon defendant's ability to rebut the identification. The Ross majority concluded that the delay was too long because the prosecution failed to justify the extension of the investigation beyond what would have been an acceptable four-month period, and while the factors which the police considered in deciding when to terminate the investigation may have been relevant, they did not in any case take into account the interest of the accused in knowing as soon as possible of the charge against him in order that he might have prepared most effectively to rebut it. In addition, the court was greatly distressed by the method of identification, apparently feeling that the uncorroborated testimony of a single officer who lacked independent recollection was of insufficient weight to form the basis of a conviction almost as a matter of law.
In connection with the third factor the court attached significance to defendant's limited education; his circumstances, in that there appeared to be little to differentiate one day from another, especially as they began to recede into the past; that he had no regular employment; that he kept no diary or other record, and that he received little mail. The court was of the view that the failure of memory and his inability to reconstruct what he did not remember virtually *145 precluded his showing in what respects his defense might have been more successful if the delay had been shorter.
In Cannady v. United States, 122 U.S. App. D.C. 120, 351 F.2d 817 (1965), the majority refused to reverse on Ross grounds because at trial defendant testified in considerable detail about the circumstances surrounding the alleged offense. The conclusion that the defense was thus not prejudiced by a 4 1/2-month delay was considered controlling. See also Mackey v. United States, 122 U.S. App. D.C. 97, 351 F.2d 794 (1965).
Powell v. United States, 122 U.S. App. D.C. 229, 352 F.2d 705 (1965), decided two months after Ross, is something of an anomaly in that the majority opinion purports to follow Ross on the one hand while inferentially rejecting it on the other. It is to be noted that the panel deciding Powell included the dissenting judge in Ross. His Powell brothers did not participate in Ross, nor did any of the three participate in Cannady. The majority opinion in Cannady was authored by a member of the Ross majority.
The Powell case involved a five-month delay between completion of the police case against defendant and his arrest on a narcotics charge. The undercover man operated for seven months in the field. At the end of this period he filed complaints against 102 persons. While defendant alleged that the delay was purposeful, deliberate, vexatious, arbitrary and oppressive, all to his prejudice and offensive to his Sixth Amendment rights, the majority conceived the complaint as relating to the Fifth Amendment because the delay was between offense and arrest, citing Nickens v. United States, supra, thereby giving the issue the complexion of a statute of limitations question. Nevertheless, the majority felt obliged to consider the situation in the light of Ross. It said:
"We think that an accused must show two things in order to invoke an exercise of our supervisory power because of alleged basic `unfairness,' * * * resulting from claimed delay in his arrest: that there was no legitimate reason for the delay, and that he was prejudiced by the delay."
*146 The majority here was of the view that the burden of proof was on defendant to establish his claim, citing Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Wilson v. United States, 218 F.2d 754, 757 (10 Cir. 1955) and Lotto v. United States, 157 F.2d 623, 626 (8 Cir. 1946). It concluded that he had failed to meet that burden.
Parenthetically, the question of where the burden of proof lies and what that burden is appears to be open to possible debate. One view seems to suggest that it is to be controlled by the determination of whether the issue is viewed as one resulting from the assertion by defendant of a constitutional right. As observed by Judge Wright in his concurring opinion in Nickens, supra:
"A showing of prejudice is not required when a criminal defendant is asserting a constitutional right under the Sixth Amendment. Taylor v. United States, supra; Petition of Provoo, supra, [17 F.R.D.], at 203; United States v. Lustman, 2 Cir., 258 F.2d 475 (1958), cert, denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958). On the contrary, the Government bears the burden of proving `that the accused suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay.' Williams v. United States, supra, 102 U.S. App. D.C., [51], at 53, 250 F.2d [19], at 21."
However, in Jackson v. United States, 122 U.S. App. D.C. 124, 351 F.2d 821 (1965), Judge Wright, writing for a unanimous court, seems to accept the proposition that in cases of this type (undercover narcotics, five-month delay, uncorroborated testimony of the agent without independent unrefreshed recollection, one-year field operation by agent, five defendants, etc.) the burden is on defendant to make some initial showing. This was characterized as not being proof of prejudice beyond a reasonable doubt or even by a preponderance of the evidence. Rather, quoting Ross, the accused is required to establish only "a plausible claim of inability to recall or reconstruct the events of the day of the offense."
*147 Judge Wright also dissents in Powell, taking the majority to task for its failure to give due regard to Ross. However, his main complaint plainly relates to his disapproval of permitting convictions to stand predicated upon the uncorroborated testimony of an undercover agent in spite of the fact that prosecution was purposefully delayed for a period of several months during which the accused-to-be, innocent or guilty, would have no way of knowing the Government was holding a charge against him. As previously noted, this was a substantial factor in producinng the result in Ross where the majority went so far as to state the following:
"It seems fair to say that our solidarity as to the remand in this case, and the fact of identical remands in other pending appeals, reflected a growing apprehension upon the part of many members of this court as successive cases have come to establish the pattern and effect of the undercover narcotics operations of the Metropolitan Police. The recurring spectacle [emphasis added] of convictions based solely upon the testimony of a police witness who, by reason of lapse of time, could not testify on the basis of unaided personal recollection, began to implant doubts as to the propriety of permitting the reasonableness of the delay, in this very narrow and specialized class of narcotics cases, to be `controlled exclusively by the applicable statute of limitations.'"
In sum, the Powell majority concluded that defendant failed to impeach either the necessity for or the investigative activities of the agent and therefore fell short of his establishing his due process claim. It held that both the absence of a valid reason for pre-arrest delay and the fact of prejudice are necessary to raise the due process claim. The claim of failure of recollection, standing alone, was found to be lacking in constitutional dimension.
As for Ross, the majority in Powell observed:
"The division of the court which decided Ross failed to follow a long line of decisions of the Supreme Court and of this court, including our own recent decisions in Morgan v. United States, 115 U.S. App. D.C. 310, 319 F.2d 711, rehearing en banc denied, cert. denied, 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963), and Wilson v. United States, supra, note 3. Indeed the Wilson court explicitly stated: `The uncorroborated testimony of a narcotics agent is *148 sufficient to support conviction for violation of narcotics laws.' [Wilson v. United States, 118 U.S. App. D.C. 319, 335 F.2d 982 (1964)] * * * this court rejected, by a vote of 6 to 3, rehearing en banc in Wilson, not only on the corroboration phase of the case but also on the lapse of time between the offense and the arrest."
Another noteworthy case is Woody v. United States, 124 U.S.App.D.C. 192, 370 F.2d 214 (1966). As in Ross, defendant was convicted for the sale of narcotics solely on the basis of the uncorroborated testimony of an undercover agent. Here the delay between offense and arrest was four months, a period which the Ross court seemingly would have found acceptable there. The reversal, also as in Ross, was by a split vote of 2-1. The three separate opinions filed in Woody all recognize the validity of the principles enunciated in Ross and accept them as controlling. However, the majority achieved concurrence via entirely different routes, and one of the majority opinions is more in keeping with the views expressed in the dissent with respect to the standard to be applied in determining under what circumstances a four-month purposeful delay will preclude prosecution.
All three members of the Woody panel agreed that a delay of four months is not so unreasonable as to warrant reversal of a conviction, absent special circumstances, even though defendant claimed an inability to recall the events of or his whereabouts on the date of the offense. Judge McGowan, a member of the Ross majority, found sufficient special circumstances from the fact that two weeks before the complaint was filed a potential witness for defendant, a woman with whom he may have been living, passed away, thereby depriving him of a possible alibi witness. This was coupled with the further fact that a person whom defendant was planning to call as his witness became unwilling when he himself was indicted. Judge McGowan seemingly viewed this as a dubious prosecution tactic since the offense upon which that charge was made was fairly old and the indictment did not come until after the prosecution became aware of defendant's intention to use him as a defense witness.
*149 Judge Bazelon, the other member of the majority, concentrated on finding fault with the method of identification and the tactics of the police. In sum, he based his conclusion upon his analysis of the identification process which he judged to be unreliable, and what he called the absence of police efforts to reduce the prejudice. Judge Bazelon expressed the view that the reliability of the identification might be enhanced where it is possible for the police to enter into repeat sales with the suspect, make the identification without unnecessary delay after the sale, obtain corroborating witnesses to the transaction, or assure that the undercover officer makes complete notes and confronts personally the accused at the time of the arrest, instead of waiting until trial perhaps months later.
Judge Burger, now Chief Justice designate of the United States Supreme Court, author of the Nickens majority opinion, here dissents. In his view Ross is a case to be read restrictively since it represents the outer limit of burdens placed on the prosecution of narcotics peddlers. He finds a total absence of any special circumstances to justify Judge Bazelon's attempted extension of Ross. As to Judge McGowan's assessment of the presence of prejudice in the case by reason of the death of one potential witness and the circumstances of the unavailability of another, Judge Burger simply disagrees because ultimate and actual prejudice was not in his judgment demonstrated. Rather it was all potential and essentially speculative. Judge Burger notes that Judge McGowan, as an author of Ross, expressly rejected therein the basis upon which Judge Bazelon here posits his thesis for reversal of the conviction.
From the foregoing it is quite clear that no uniform test has as yet been devised which has gained universal acceptance. It is quite apparent that a substantial philosophic conflict exists among the several judges who have participated in these decisions. However, based upon my evaluation of the problem involved it is my view that a given case must be approached on essentially the following basis:
*150 (1) Whether a defendant's Sixth Amendment rights have been violated is not a matter which can be resolved simply by reference to the pertinent statute of limitations.
(2) If the delay between offense and charge is purposeful and oppressive, an indictment obtained within the statute of limitations may nevertheless be constitutionally offensive.
(3) In the utilization of the undercover agent technique in the detection of narcotics offenses some purposeful delay between the offense and the arrest is inevitable and hence to a degree acceptable.
(4) When the delay reaches such a proportion that the ability of a defendant to defend is materially affected it is necessary to strike a balance between the competing interests if one or the other is not to be sacrificed completely.
(5) The initial burden is on the accused to demonstrate a plausible claim of inability to remember or reconstruct the events of the day of the offense and that he has been prejudiced thereby. This burden of proof is not proof beyond a reasonable doubt nor even by proof that is clear and convincing. Rather, it seems more logical to require the accused to establish his claim by a preponderance of the probabilities, that is, something beyond a mere assertion of an inability to recall or reconstruct. With regard to the showing of prejudice, however, a rule of reason must prevail. It may very well be in a given case that the inability to recall may virtually preclude a showing as to how the defense may have been more successfully prepared had the delay been shorter.
(6) If the accused is able to make such a showing, it then becomes the burden of the prosecution to establish, at least clearly and convincingly and probably beyond a reasonable doubt, the validity of a claim of necessity for the pre-arrest delay, the relevance of the reasons assigned in support thereof, and that the decision as to when to terminate the investigation took into account not only the police and public interest in effective narcotics law enforcement but also that of the accused-to-be in knowing as soon as possible after the *151 criminal event that he was being charged in order that he might prepare most effectively to defend.
(7) The balance test cannot be performed on the basis of a precise formula. A weighing of all pertinent facts and circumstances on both sides must be undertaken. The ultimate result in a particular situation must turn in the final analysis upon considerations of fundamental fairness and essential justice.
(8) A purposeful delay of four months is not per se prejudicial. The shorter the delay the less likelihood of prejudice. Conversely, the longer the delay the greater the possibility of prejudice.
(9) The question of the sufficiency of the evidence as to the identity of a defendant, based entirely upon the uncorroborated testimony of an undercover agent with no independent recollection of the particular defendant or the unlawful transaction, but whose identification testimony and version of the occurrence is based wholly upon a recollection refreshed by reference to his contemporaneously made notes, is irrelevant to the inquiry.
It appears that a number of the judges participating in the federal decisions referred to herein entertain the view that minimum standards of proof to establish guilt beyond a reasonable doubt ought to require something more reliable. Perhaps the law ought to be changed, but as matters presently stand, jurors are permitted to find facts based upon the testimony of a single witness whom they find to be worthy of belief. Jurors are made aware of the many and varied criteria which they may consider in assessing the credibility of a witness. In addition, the witness may be subjected to broad and intensive cross-examination so that the quality and reliability of the identification testimony can be fully tested. Surely the time interval between offense and trial can be brought out and the limited ability of the agent to recall demonstrated. Moreover, the nature and scope of the agent's undertaking, the length of the investigation, the number of other contacts involved, and the agent's training *152 and experience, or lack of same, are among the legitimate area of inquiry. In the further light of an effective instruction by the trial court as to the presumption of innocence and the burden of proof, it is difficult to agree that a problem even exists apart from whether it bears relevance to the question here presented. In my judgment, it does not.
At any rate, it is my determination that there was a purposeful delay on the part of the police in this instance as it affects defendant, to the extent of four, two and one-half, and two months as to the alleged offenses of June 25, August 13 and August 28, respectively. I find that defendant has met the initial burden of demonstrating a plausible claim of inability to remember or reconstruct the events of any and all of the days of the alleged offenses.
I find, further, that as a consequence his ability to defend is to some degree materially affected because he is unable to assist his very able and ordinarily effective counsel in being completely effective. For example, counsel is unable to determine whether defendant has an alibi and, if so, whether proofs can be assembled to document it. Similarly, if defendant was in fact present at the time and place of the alleged occurrence and was able to recall it, he might also be able to assist counsel in identifying witnesses who also may have been present who could testify to his nonparticipation in the criminal event, if that be the fact. Likewise, if defendant could recall and actually remembered that he did perform one or more of the unlawful acts charged, the communication of the fact of his guilt to his attorney would enable counsel to effectively advise defendant in such areas as the prospective advantage of a plea of guilty as it relates to sentence and as a step forward in the rehabilitation process. In this latter connection, counsel is powerless to act because a plea of guilty would not be accepted by the court unless defendant was not only willing but able to admit his guilt, it being accepted practice in such cases for the court to require a defendant to narrate the factual basis upon which the plea is predicated.
*153 On the other hand, it is my further determination, on the basis of the testimony of Detective La Citra, that the State has established as a fact beyond a reasonable doubt that the delays between offense and charge were necessary, and that the decision as to when to terminate the investigation took into account the respective interests of the public and the defendant.
Initially it should be observed that the longest delay insofar as defendant is concerned is four months. As noted, a four-month delay is not per se offensive. There appears to be no reported case in which a delay of as little as four months was the basis, wholly or in part, for the reversal of a conviction. The cases suggest that an undercover narcotics investigation by its nature appears to typically require a life-span ranging from four months to a year in order to effectively achieve its laudable objective. This accords also with Detective La Citra's testimony as to his experience. I find that Detective La Citra, in deciding when to terminate this investigation, was not unmindful of the constitutional rights of the various suspects including those of defendant. Though not readily measurable, it is my impression that it played a part in arriving at his decision. He declared, convincingly in my view, that he would not intentionally violate anyone's constitutional rights by any decision he might make as to the form, course or length of an investigation. This is not to say that it could not occur unintentionally. All it means is that as a veteran police officer with heavy narcotics experience this officer recognizes that the rights of suspects must be kept in mind at all times. The relatively short four-month life span of this investigation bespeaks deference to the right of an accused to know as soon as practically possible.
A further evidence of Detective La Citra's concern for the rights of potential defendants is the policy of making repeat buys from the same sellers. It is argued that as soon as the repeat buys began to occur in substantial numbers the usefulness of the investigation was over and should have been terminated out of deference to the rights of prospective defendants *154 to know that they were to be charged. However, the clear and stated purpose of making repeat buys was to make certain that these sellers were the persons actually participating in a repetitive pattern of illegal narcotics activity.
Aside from the fact that it makes certain that the investigation is reaching the "pushers," it can readily be seen that the policy of making repeat buys has the beneficial effect of minimizing the possibility of an erroneous identification, something of which defendant prospectively, speculatively and prematurely complains. As a matter of fact, this practice is something which Judge Bazelon specifically suggests ought to be done for the protection of persons who are the subjects of this kind of undercover investigation.
I find, further, that the statistical data, if anything, supports the police decision to keep this investigation open through October. All of the legitimate objectives in terms of reaching new sellers and making the very desirable repeat buys continued into October. There is no legitimate basis for the argument that as soon as the percentage of repeats exceeded the percentage of new buys the investigation ought to have been terminated. This simply is not something which can be determined empirically. It is an easy matter after the fact to tabulate the results and argue retrospectively with the aid of comparative percentages and graphs that an investigation should have been terminated at some earlier point in time. This approach ignores other practical considerations which the person in charge of the investigation must take into account as it progresses and unfolds. Moreover, this person has a close-up feel of the situation based upon his day-to-day contact with the undercover agent, his knowledge of the particular area unnder investigation, the level of narcotics activity which he believes exists therein based upon the flow of information, and many other intangibles, none of which can be tabulated or graphed. Based upon his feel of the case he is the one best able to judge whether permitting the investigation to continue is likely to prove productive.
*155 I find that Detective La Citra's opinion that this investigation was properly terminated in October is entitled to substantial weight. I base this in part upon his impressive qualifications and broad experience in the field of narcotics investigation. In addition, he was the person actually in charge of this investigation and as such has the advantage of knowing of his own personal knowledge the situation in the field as it existed on a day-to-day basis. Moreover, he demonstrated that he is and was aware of and actually then considered the relevant criteria which the decision making process requires. Thus, the State has proved the justification for the delay beyond a reasonable doubt.
In the final analysis, the question would appear to be whether defendant must accept the possible detriment occasioned by the legitimate delay in deference to the need of the public for effective narcotics law enforcement. Detection and prosecution of narcotics offenses present many practical difficulties. The activity is customarily conducted in secret. Transactions are always consensual. There are no complaining witnesses or victims in the usual sense. The magnitude of the public need cannot be underestimated. Drug traffic and narcotics abuse is a matter of grave national concern. Drug addicts, in order to support their habits, resort to robbery and burglary. Millions of dollars each year is taken from victims too numerous to count. The public fear is ever increasing. Many addicts resort to pushing narcotics in order to fund their habits. This creates more and more users. More and more lives are thus being wasted as a result of the cancerous growth of this traffic. Use of the undercover agent by the police has proved to be an effective means of hampering narcotics traffic. See Chapter 8, Narcotics and Drug Abuse, The Challenge Of Crime In A Free Society, A Report By the President's Commission On Law Enforcement And Administration Of Justice (1967), at p. 211 et seq.
While defendant is handicapped to some degree by his inability to recall, this is not prejudice of sufficient magnitude or so offensive to his constitutional rights as to require *156 dismissal of the charges. At trial the State will still have the heavy burden of proving the guilt of defendant beyond a reasonable doubt. Defendant does not have to prove his innocence. Through counsel he will have the opportunity for thorough cross-examination of the State's witness. The machinery exists for a scrupulous examination of the basis of any identification testimony even before it reaches the ears of the jury. With all of the other traditional safeguards defendant is not helpless to defend. At most it is made a little more difficult. On balance, it is my conclusion that any detriment to defendant here present is far outweighed by the greater public need for effective narcotics law enforcement in the broad general sense coupled with the substantial legitimate reasons for the relatively short pre-arrest delay. The motion to dismiss the indictment is consequently denied.