298 S.E.2d 879

**STATE of West Virginia**

v.

**Clyde H. RICHEY.**

**No. 15235.**

Supreme Court of Appeals of West Virginia.

Dec. 15, 1982.

McIntyre, Haviland & Jordan and James B. McIntyre, Charleston, for appellant.

James E. Roark, Pros. Atty., and Frances W. McCoy, Asst. Pros. Atty., Charleston, for appellee.

MILLER, Chief Justice:

This is an appeal from the criminal conviction adjudging the defendant-appellant, Clyde H. Richey, guilty of sexual assault in the third degree and placing him on probation. The defendant was found to have sexually molested a fourteen-year-old boy in a Charleston motel. The defendant was serving as a member of the West Virginia House of Delegates and the victim was a legislative page. The particular facts surrounding the incident and the events at trial are recited only as they are relevant to the issues on appeal.

The defendant asserts several assignments of error. After careful consideration of each, we find no reversible error and affirm the judgment of the trial court.

## I.

### PROSECUTORIAL DELAY IN OBTAINING THE INDICTMENT

The first assignment of error is the trial court's denial of the defendant's motion to dismiss the indictment on the grounds of prejudicial prosecutorial delay in obtaining the indictment. The crime allegedly occurred on February 22, 1979, and the grand jury indictment was returned on June 19, 1979. The defendant was not arrested prior to the returning of the indictment. He claims that the delay was prejudicial in that investigative facts could not be gathered. In *State ex rel. Leonard v. Hey*, W.Va., 269 S.E.2d 394 (1980), we held that where eleven years elapsed between the identification, location and connection of the defendant with the criminal act and his formal accusation, there was *prima facie* prejudice that violated his constitutional due

process rights.[1] In Syllabus Point 2 of *Leonard, supra,* we spoke to the situation where a less extensive pre-indictment delay is involved: "The effects of less gross delays upon a defendant's due process rights must be determined by a trial court by weighing the reasons for delay against the impact of the delay upon the defendant's ability to defend himself."

In *State v. Maynard,* 170 W.Va. 40, 289 S.E.2d 714 (1982), we found that a three-month delay between the commission of the offense and the filing of the charges did not result in violating the defendant's due process rights. The evidence against the defendant was acquired in the course of an undercover operation and we viewed the State as having a need for some delay to prevent exposure of its undercover informers and to analyze the evidence. *See also State v. Ayers,* 168 W.Va. 137, 282 S.E.2d 876 (1981).

■ Here, the record is silent as to any specific facts that would demonstrate why the approximate three-month delay has prejudiced the defendant. The motion to dismiss was filed on December 17, 1979, six months after the returning of the indictment, and asserted only general grounds.[2] While *Leonard, supra,* created a *prima facie* ground of prejudice for an extreme or gross delay, the general rule is that where there is a delay between the commission of the crime and the return of the indictment or the arrest of the defendant, the burden rests initially upon the defendant to demonstrate how such delay has prejudiced his case if such delay is not *prima facie* excessive.

Justice Marshall in writing for the majority in *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048–49, 52 L.Ed.2d 752, 759 (1977),[3] made this summary based on *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), in regard to the requirement of proof of prejudice: "Thus Marion makes clear that proof of prejudice is generally a necessary element but not sufficient element of a due process claim and that the due process inquiry must consider the reason for the delay as well as the prejudice to the accused." In *Arnold v. McCarthy,* 566 F.2d 1377, 1382 (9th Cir.1978), this concept was expressed as follows:

"Under the more lenient due process standard applicable to this period, proof of actual prejudice is necessary before a claim of pre-indictment delay is ripe for adjudication. *United States v. Lovasco, supra,* [431 U.S. 783] at 789–790, 97 S.Ct. 2044 [at 2048–2049, 52 L.Ed.2d 752]; *United States v. Mays,* 549 F.2d 670, 675 (9 Cir.1977). There has been no showing

---

1. *Leonard, supra,* followed the reasoning of *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), where the United States Supreme Court concluded that prearrest or pre-indictment delays raise a due process constitutional issue rather than a Sixth Amendment speedy trial issue because historically the speedy trial right was thought not to arise until the defendant was arrested or indicted.

2. The relevant portions of the motion are:

"[1.] This prosecutorial delay has irreparably harmed the defendant in that vital avenues of investigation which otherwise would have been opened to the defendant have been forever closed.
   "2. The State of West Virginia did not pursue a course of investigation which could have led to the acquisition of exculpatory evidence which the defendant could then have obtained by proper motion."

3. In *United States v. Lovasco, supra,* the United States Supreme Court held that an eighteen-month pre-indictment delay did not violate the defendant's due process rights and identified several policy factors that justified a prosecutorial delay. It recognized that there may be instances involving multiple criminal transactions or multiple parties where further investigation would be hampered if the prosecutor were compelled to promptly proceed when he had sufficient evidence as to one person or charge. The Court observed that in circumstantial cases the evidence is seldom clear cut and to this extent the decision on whether there is sufficient evidence cannot be determined with precision. For this reason, it would seem inappropriate to have a merely mechanical matching of the date of the crime and the date of the indictment or arrest because the intervening delay could well be due to the difficulty in procuring sufficient evidence. A final consideration was that if immediate prosecution was required, then in a close case, the prosecutor rather than proceed to further investigation would be pressured to initiate prompt prosecution which might be detrimental to the defendant.

of any actual prejudice to Arnold arising from the one-year delay between the commission of the crime and his first arrest."

*See also United States v. Mays,* 549 F.2d 670 (9th Cir.1977); *Scott v. State,* 263 Ark. 669, 566 S.W.2d 737 (1978); *Smith v. United States,* 414 A.2d 1189 (D.C.App.1980); *People v. Lawson,* 67 Ill.2d 449, 10 Ill.Dec. 478, 367 N.E.2d 1244 (1977); *State v. Rountree,* 106 N.J.Super. 135, 254 A.2d 337 (1969); *State v. Rogers,* 70 Wis. 160, 233 N.W.2d 480 (1975).

■ We conclude that the defendant has failed to demonstrate any facts which would show prejudice by the delay.

## II.

### FLIGHT INSTRUCTION

The defendant claims that the trial court erred in giving the State's flight instruction. This instruction was based on evidence that the defendant after learning of the indictment, consulting with a lawyer, and being advised of the date set for his arraignment, left the State. He did not return until three weeks after the arraignment date. While a capias was issued, he returned and answered the indictment before he could be located and served. The defendant claims that the giving of the flight instruction endorsed the State's position that the defendant's flight was circumstantial proof of his guilt.

■ In *State v. Payne,* 167 W.Va. 252, 280 S.E.2d 72, 79–80 (1981), we made an extensive review of the flight instruction question and summarized situations in which courts have permitted the use of a flight instruction:

"That evidence of flight is admissible upon a criminal trial is an almost universal rule. Courts which have addressed the more specific question have also, generally, held that jumping bail, issuance of a capias, extradition proceedings and failure to appear for trial are admissible as evidence of flight. In general, the time of the flight does not have to be immediately after the commission of the crime in order for the evidence to be admissible. We do not here consider the case where the defendant was not aware that he was a suspect in the case." (Footnotes omitted)

*Payne* also authorized the use of an *in camera* hearing to enable the trial court to develop the facts surrounding the flight issue in order to determine if a flight instruction was appropriate.

"In certain circumstances evidence of the flight of the defendant will be admissible in a criminal trial as evidence of the defendant's guilty conscience or knowledge. Prior to admitting such evidence, however, the trial judge, upon request by either the State or the defendant, should hold an *in camera* hearing to determine whether the probative value of such evidence outweighs its possible prejudicial effect." Syllabus Point 6, *Payne, supra.*

The *Payne* decision was handed down after the trial in this case and no *in camera* hearing was requested or held in this case.[4] Consequently, no error can be claimed based on the failure to hold an *in camera* hearing since no request was made. *Paynes' in camera* hearing procedure is not a constitutional dimension right and, therefore retroactivity is limited as follows:

"In the absence of any substantial countervailing factors, where a new rule of criminal law is made of a nonconstitutional nature, it will be applied retroactively only to those cases in litigation or on appeal where the same legal point has been preserved." Syllabus Point 3, *State v. Gangwer,* 168 W.Va. 190, 283 S.E.2d 839 (1981).

■ Facts of flight existed in the present case since the defendant was personally aware of the indictment and the

---

**4.** The trial court did have a bench conference upon the defendant's objection when the State started to introduce some evidence on flight. The trial court overruled the defendant's objection based on its belief that the defense attorney had brought out the defendant's failure to appear at the arraignment and his subsequent voluntary return on voir dire and in his opening statement. Such facts were brought out by the defense attorney on voir dire, but not in his opening statement.

arraignment date, and did not appear at the prescribed date. As mentioned in note 4, *supra*, the flight issue was initially raised by the defense. Furthermore, the trial court permitted the defense to introduce evidence to show the defendant's reasons for leaving and his voluntary return. Under all these circumstances, we do not find the giving of the flight instruction to be reversible error.

## III.

## THE IMPEACHMENT OF WITNESS CALLEN

The defendant claims that the trial court erred in allowing the prosecuting attorney to cross-examine a defense witness, Stephen Callen, regarding the falsification of records and in refusing to strike the prosecutor's comments in his closing argument in that regard. The State claims that the questioning was proper as it attempted to impeach the witness' character as to truth and veracity. The line of questioning was designed to elicit an admission from the witness that the Clarksburg branch of the West Virginia Career College had its qualifications for veteran's educational benefits withdrawn by the Board of Regents because the school falsified information reported to the Veteran's Administration. Callen was the president of the Career College.

■■■ We have recognized several basic rules as to cross-examination of a witness. The first is:

5. The cross-examination of a criminal defendant is governed by different rules. Generally, he may not be cross-examined as to his bad character unless he has placed his good character in issue. Furthermore, he may not be examined as to prior criminal convictions, if he has not placed his character in issue, except for convictions of perjury and false swearing. *State v. McAboy*, 160 W.Va. 497, 236 S.E.2d 431 (1977); *cf. State v. Beck*, 167 W.Va. 830, 286 S.E.2d 234, 242 (1981) (as to scope of cross-examination where the defendant's character is placed in issue).

6. These terms are somewhat confusing since they are often used interchangeably. The term "character" is a more general term often involving substantive issues such as in defamation

"As a general rule, the scope of cross-examination is coextensive with, and limited by, the material evidence given on direct examination. *See generally, State v. Koch*, 75 W.Va. 648, 84 S.E. 510 (1915); *State v. Carr*, 65 W.Va. 81, 63 S.E. 766 (1909); *State v. Hatfield*, 48 W.Va. 561, 37 S.E. 626 (1900)." *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389, 394 (1982).

The second is that a witness may also be cross-examined about matters affecting his credibility. The term "credibility" includes the interest and bias of the witness, inconsistent statements made by the witness and to a certain extent the witness' character.[5] *State v. Lawson*, 128 W.Va. 136, 36 S.E.2d 26 (1945); 20 Michie's Jurisprudence *Witnesses* §§ 71, 72 (1979); F. Cleckley, Handbook on Evidence for West Virginia Lawyers §§ 20, 21 (1978). The third rule is that the trial judge has discretion as to the extent of cross-examination. *State v. Wood*, 167 W.Va. 700, 280 S.E.2d 309 (1981); *State v. Charlot*, 157 W.Va. 994, 206 S.E.2d 908 (1974).

The specific area involved in the present case is whether a witness can be cross-examined as to allegedly falsified records of a corporation of which he is president. Since the falsified records are not relevant to an issue in the present case, it is clear that the line of inquiry was designed to discredit the witness' character by attacking his credibility.[6]

Ordinarily, impeachment of a witness' character is done through another witness stating a general opinion as to the first witness' reputation for truth and veracity in the community.[7] *State v. Gangwer*,

actions, whereas "credibility" which is often discussed as a part of the character of the witness is generally limited to the witness' reputation for truth and veracity. In the impeachment area the terms tend to be synonymous. *See* F. Cleckley, Handbook on Evidence for West Virginia Lawyers §§ 21(F), 30, 31 (1978); McCormick, Evidence §§ 41, 44, 186 *et seq.* (2d ed. 1972).

7. This rule is similar to Rule 608(a) of the Federal Rules of Evidence:

"*Opinion and reputation evidence of character.* The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only

169 W.Va. 177, 286 S.E.2d 389 (1982). In *State v. Driver*, 88 W.Va. 479, 107 S.E. 189 (1921), we stated this principle in part of Syllabus Point 3:

> "The usual method of impeaching the credibility of a witness as one who will not tell the truth and is unworthy of belief is to show the bad general reputation of the witness for truth and veracity in the community where she lives, by impeaching witnesses who know that reputation."

*See also* 81 Am.Jur.2d *Witnesses* § 563 (1976).

There is also authority that permits a witness to be cross-examined about particular acts that directly bear on his veracity. *Simon v. United States*, 123 F.2d 80 (4th Cir.1941), *cert. denied*, 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555; *Vogel v. Sylvester*, 148 Conn. 666, 174 A.2d 122, 96 A.L.R.2d 893 (1961); *Williams v. State*, 386 So.2d 25 (Fla.App.1980); 81 Am.Jur.2d *Witnesses* § 592 (1976). This rule is often discussed under a more general topic relating to impeachment of a witness by cross-examination of prior acts of misconduct for which

there has been no criminal conviction. *See United States v. Fortes*, 619 F.2d 108 (1st Cir.1980); *Carter v. Hewitt*, 617 F.2d 961 (3rd Cir.1980); *United States v. Opager*, 589 F.2d 799 (5th Cir.1979); 10 Moore's Federal Practice §§ 608.20, 608.21 (1982). Ordinarily, cross-examination is limited in this area. McCormick, Evidence § 42 (2d ed. 1972).[8]

We have permitted impeachment of a witness by prior acts of misconduct but we have stressed that if " '[1] the cross-examination relates to a recent transaction or conviction [2] *"bearing directly* upon the *present* character and moral principles of the witness, and [3] therefore *essential* to the due estimation of his testimony by the jury" ... [4] the court may permit the inquiry, within reasonable limits.' ... *State v. Price*, 113 W.Va. 326 [334], 167 S.E. 862 [866 (1933)]." *State v. Justice*, 135 W.Va. 852, 863, 65 S.E.2d 743, 749 (1951). (Emphasis added) *See also State v. Lucas*, 129 W.Va. 324, 40 S.E.2d 817 (1946); *State v. Hill*, 52 W.Va. 296, 43 S.E. 160 (1902).[9] We need not for the purposes

---

to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."

**8.** McCormick, *supra* at 82–83, gives this summary:

"At present, however, it can be said generally that the majority of courts limit cross-examination concerning acts of misconduct as an attack upon character to acts which have some relation to the credibility of the witness. Some courts permit an attack upon character by fairly wide-open cross-examination upon acts of misconduct which show bad moral character and can have only an attenuated relation to credibility. Finally, a substantial number of courts prohibit altogether cross-examination as to acts of misconduct for impeachment purposes." (Footnotes omitted)

*See also* 98 C.J.S. *Witnesses* § 502 (1957); 81 Am.Jur.2d *Witnesses* § 591 (1976). Rule 608(b) of the Federal Rules of Evidence which encompasses this rule states:

"*Specific instances of conduct.* Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired

into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

"The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility."

**9.** We are aware that some of our earlier cases suggest that a question on cross-examination that tends to impugn or degrade the character of a witness can only be objected to by that witness. *E.g., State v. Lucas, supra; State v. Hill, supra.* It is not certain that this was ever an absolute rule. In part of Syllabus Point 3 of *State v. Lucas, supra*, we said "but if such witness, without claiming such privilege, is required to and does answer the question, it will not be error in the trial of the accused, unless it appears, from the whole case, that he has been prejudiced."

We believe that this rule is unrealistic and against the modern view. Certainly, the party sponsoring a witness can through his attorney object to other areas of improper cross-examination such as hearsay or immateriality and should be permitted to object to improper cross-examination of the character of a witness.

of this case determine how far the cross-examination of a witness should be allowed for prior acts of misconduct that do not bear upon his truth and veracity. The modern trend is to limit such cross-examination.

■ In the present case, the cross-examination of Callen was an appropriate inquiry since it involved the witness' participation in and knowledge of falsification of records. This was a test of the witness' character for truth and veracity. Although the witness denied knowledge of any falsification, the questioning proceeded, without additional objection, specifically as to whether the witness had knowledge that other employees had falsified records and this he also denied. The witness was permitted to give a full explanation of the circumstances which exonerated him, and, consequently we find no error on this point.

## IV.

### PROOF OF THE DEFENDANT'S AGE

The defendant argues that the trial court erred in denying his motion for a directed verdict because the State failed to prove the defendant's exact age. He claims proof of age was a material element of the offense. The exact age of the defendant is not an essential element of the crime of third degree sexual assault. Under W.Va. Code, 61–8B–5, the elements of the offense are that the defendant must be over sixteen years of age and at least four years older than the victim who must be less than sixteen years of age.[10] The State's proof was that the victim was under sixteen years of age being of the age of fourteen. The other element to be proved was that the defendant was more than four years older than the victim, i.e. over eighteen.

The State argues that it met the second statutory requirement by having the victim testify that he believed the defendant's age to be between forty and fifty. It was also shown that the defendant was a member of the West Virginia House of Delegates and that the minimum age for membership for that position is eighteen. W.Va. Const. art. IV, § 4. Finally, the State argues that the defendant was present in the courtroom and the jury had the opportunity to evaluate his age. We view this as relevant particularly where exact age was not required to be proved but only that the defendant was eighteen or over.

The defendant cites *State v. Spielman*, 105 W.Va. 370, 142 S.E. 523 (1928), which involved a prosecution for statutory rape and the question of whether the victim's age as being under sixteen had been proved. We held that the uncontradicted testimony of the victim as to her age, although in the nature of hearsay, was competent to go to the jury. There was also additional evidence as to her age from her mother and father.

The Supreme Court of Nebraska in *State v. Lauritsen*, 199 Neb. 816, 261 N.W.2d 755 (1978), has discussed the proof of age question in a sexual offense case where the defendant had to be shown to be at least eighteen years of age. At trial, there was no estimate of the defendant's age by any witness, but the court noted he was observed by the jury. There was some peripheral evidence that he visited a tavern and purchased beer and that he was a member of the Ku Klux Klan. The court noted that under Nebraska law one had to

---

**10.** W.Va.Code, 61–8B–4, contains two definitions of third degree sexual assault. The State was proceeding under W.Va.Code, 61–8B–5(a)(2). The full text of the statute is:

"(a) A person is guilty of sexual assault in the third degree when:

"(1) He engages in sexual intercourse with another person who is incapable of consent because he is mentally defective or mentally incapacitated; or

"(2) Being sixteen years old or more, he engages in sexual intercourse with another person who:

"(i) Is incapable of consent because he is less than sixteen years old; and

"(ii) Is at least four years younger than the defendant.

"(b) Any person who violates the provisions of this section shall be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than one year nor more than five years, or fined not more than ten thousand dollars and imprisoned in the penitentiary not less than one year nor more than five years."

be at least nineteen years of age to purchase alcoholic beverages and there was evidence to show that one had to be eighteen to join the Klan. In holding that there was sufficient evidence to carry the question to the jury, the court summarized the law as follows:

"It is uniformly the rule that a defendant's physical appearance may be considered by the jury in determining his or her age. See, II Wigmore on Evidence, § 222, pp. 5, 6 (3d Ed. 1940); *Torres v. State*, 521 P.2d 386 (Alaska, 1974); *State v. Hemmenway*, 80 S.D. 153, 120 N.W.2d 561 (1963); *State v. Fries*, 246 Wis. 521, 17 N.W.2d 578 (1945). It has been held, however, that the jury may not fix the age of the defendant by merely observing him during the trial; and that there must be some other evidence in conjunction with the appearance of the defendant. See, *Slocum v. People*, 120 Colo. 86, 207 P.2d 970 (1949); *People v. Grizzle*, 381 Ill. 278, 44 N.E.2d 917 (1942); *Commonwealth v. Hines*, 282 Ky. 791, 140 S.W.2d 386 (1940)." 199 Neb. at 819, 261 N.W.2d at 757.

We conclude that where the exact age is not required to be proved, the defendant's physical appearance may be considered by the jury in determining age but that there must be some additional evidence suggesting the defendant's age.

Although the State was rather careless in presenting evidence on the age element in the present case, we believe there was sufficient evidence to carry the question to the jury and, consequently, we find no error.

## V.

### FAILURE TO EXCLUDE STUDENT SPECTATORS

A claim is made that the defendant was prejudiced by the trial court's permitting a group of high school students to be present at the trial during the victim's testimony. The defendant argues that their presence may have psychologically influenced the jurors against the defendant in that the students were of the same age as the victim. There is no suggestion that their appearance was collusively procured. In *State ex rel. Herald Mail Co. v. Hamilton*, 165 W.Va. 103, 267 S.E.2d 544 (1980), we discussed at some length our public trial and open-court constitutional rights found in Sections 14 and 17 of Article III of the West Virginia Constitution, stating in Syllabus Point 1:

"Article III, Section 14 of the West Virginia Constitution, when read in light of our open courts provision in Article III, Section 17, provides a clear basis for finding an independent right in the public and press to attend criminal proceedings. However, there are limits on access by the public and press to a criminal trial, since in this area a long-established constitutional right to a fair trial is accorded the defendant."

The *Herald Mail* case dealt with a pretrial closure order but much of what we said would be applicable to excluding the public at the trial itself. In Syllabus Point 2, in part, we said "the ultimate question is whether, if the ... hearing is left open, there is a clear likelihood that there will be irreparable damage to the defendant's right to a fair trial."

In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the defendant moved that his murder trial should be closed to the public, and since the prosecutor did not object to the closure, the judge ordered the trial closed. Members of the press objected. Although a majority of the Court could not agree on the details of the reasoning, the United States Supreme Court held the closure order to be improper. There appeared to be agreement that in the absence of some overriding interest the trial court could not close the trial to the public. The fact that the defendant wants the trial closed is not of itself an overriding interest.

In *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), a Massachusetts statute, which mandated excluding the press and general public from the courtroom during the testimony in certain specified sexu-

al offenses, was found to be unconstitutional as overbroad. The Court indicated that there may be occasions when the State can show a compelling governmental interest to justify the closure but that the closure must also be narrowly tailored to serve that interest.[11]

One of the reasons advanced by the prosecution in *Globe Newspaper Co.* to support the statute was that it would encourage victims of sex crimes to report such crimes as they would have protection against publicly testifying at the trial. The United States Supreme Court in rejecting this argument noted that it was speculative and lacked any empirical data. Much the same criticism can be made of the defendant's argument relative to an adverse psychological impact on the jury. The defendant's argument could be made as to the attendance of the general public since their presence could arguably demonstrate community hostility. Of more direct analogy would be the presence of females at a rape trial or the presence of the victim's family and relatives at any criminal trial. We must assume that a jury has the fortitude to withstand this type of public scrutiny, and cannot presume irreparable harm to the defendant's right to a fair jury trial by the presence of spectators who may have some type of associational identity with the victim of the crime.

In neither *Globe Newspaper Co., supra,* nor *Richmond Newspaper, supra,* was there any argument presented that the defendant's right to a fair trial demanded a closure. Moreover, each of these cases dealt with an absolute closure whereas, here, a total closure was not sought. Less than absolute closure may in certain instances preclude arguments on constitu-

tional grounds. It can hardly be contended that every exclusion of a spectator at a trial will give rise to a valid claim that the constitutional provisions regarding a public trial and open-courts have been violated.[12]

We believe that the general principle found in Syllabus Point 2, in part, of *Herald Mail, supra,* is applicable where a defendant moves to exclude members of the public from observing his jury trial: "[T]he ultimate question is whether, if the ... [trial] is left open, there is a clear likelihood that there will be irreparable damage to the defendant's right to a fair trial." Here, the presence of high school students cannot be shown to irreparably damage the defendant's right to a fair trial.

## VI.

### TRIAL RECESS

The defendant also claims it was error for the trial court to recess the case for the Christmas holidays from Thursday evening, December 20, to Wednesday morning, December 26. The recess occurred during the presentation of the defense side of the case. The defendant claims that the recess interrupted the continuity of his case and could have caused some of the jurors to forget some details of the testimony.

The reason for the recess as explained by the trial court was that a number of civil matters had been previously scheduled for hearing on Friday and the judge felt that he could not postpone those hearings in view of the length of time they had been on the docket. He also recognized that Monday was the day before Christmas and de-

11. In *Herald Mail, supra,* we traced the history of the right to public trial found in the Sixth Amendment to the United States Constitution and Section 14 of Article III of our Constitution. One of the basic aims is to ensure that an accused has a public trial. There is some disagreement in the United States Supreme Court as to whether the Sixth Amendment gives a right to claim a public trial on the part of third parties. *See* majority and dissenting opinions, *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). Certainly, *Richmond Newspapers, Inc. v. Virginia, supra,* as

illuminated by *Globe Newspapers, Inc., supra,* provides public and press access through the First Amendment. We found that the open-court provision in Section 17 of Article III of the West Virginia Constitution did give such a right. *Herald Mail, supra.* It is upon our own constitutional provision that we decide the issue here.

12. Obviously, the constitutional rule does not preclude the trial court from removing unruly spectators at a trial nor the sequestration of witnesses or from other similar actions designed to protect the integrity of the trial process.

cided that the jury should not have to serve that day.

In *State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129, 138 (1979), we spoke of the general principle "that a trial court is accorded a considerable discretion in the trial of the case in order to handle the manifold exigencies that may arise. *State v. Hankish,* 147 W.Va. 123, 126 S.E.2d 42 (1962); *State v. Justice,* 135 W.Va. 852, 65 S.E.2d 743 (1951); *State v. Hamrick,* 112 W.Va. 157, 163 S.E. 868 (1932)." In accordance with this rule, courts have fashioned a more precise rule that a trial court has considerable discretion as to matters involving the length of a recess or temporary adjournment of a trial. *E.g., Allied Van Lines v. Parsons,* 80 Ariz. 88, 293 P.2d 430 (1956); *Mooney v. Olson,* 22 Kan. 69 (1879); *State v. Greengos,* 95 N.J.Super. 96, 230 A.2d 154 (1967); *Chase v. Watson,* 294 P.2d 801 (Okl.1956); 88 C.J.S. *Trial* § 36 (1955). We do not believe that the trial court abused its discretion in declaring the recess.

## VII.

## PREJUDICIAL PROSECUTORIAL CONDUCT

The main claim in this area relates to the prosecutor's use of a novel that was written by the defendant several years before the trial and which contained incidents of sexual interplay between adult and consenting juvenile males. The prosecution's theory was that if the defendant put his character in issue, the book could be utilized to impeach him. The defense attorney advised the court that he would not be placing the defendant's character in issue and consequently the court indicated the book could not be used.[13]

Even though the book was not used, it was left on counsel table by the prosecutor during portions of the trial and the prosecutor picked the book up and underlined passages in it on several occasions. The defense attorney requested the court to direct the prosecutor to remove the book from counsel table. The trial court did not require the removal of the book although it did advise the prosecutor not to attempt to use the book. The prosecutor also asked a defense witness on cross-examination if she was familiar with or had read anything that the defendant had written. The defense objected to this question and the court sustained the objection and advised the jury to disregard the question. The prosecutor was further advised that no more references should be made to the book. The defendant's motion for mistrial on this point was denied. It does not appear that any contents of the book were disclosed to the jury.

We do not approve of the tactics used by the prosecutor in this case since the defendant's novel had no relevancy in view of the advanced declaration that his character would not be placed in issue. The question directed at the defense witness as to whether she was familiar with or had read anything that the defendant had written was clearly contrary to the trial court's prior ruling that no reference was to be made to the book.[14] Such tactics have the deleterious effect of forcing the defense counsel to make needless objections which may in turn prejudice his standing with the jury.[15] We spoke to the issue of prosecutorial conduct in *State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710, 717 (1977), and concluded that because of the cumulative effect of a number of incidents of prejudicial

13. Since the defendant's character was not placed in issue, we need not pass upon the merits of the prosecutor's theory. In view of the impeachment law discussed in Section III, *supra,* we doubt that a work of fiction could be so used.

14. DR 7–106(C)(1) of the *Code of Professional Responsibility* provides: "In appearing in his professional capacity before a tribunal, a lawyer shall not: (1) State or allude to any matter that he has not reasonable basis to believe is relevant

to the case or that will not be supported by admissible evidence."

15. Much the same comment can be made about the prosecutor's question to the defendant as to whether he had introduced legislation to lower the age of marriage. The defense attorney objected and moved for a mistrial and the trial court sustained the former but not the latter. We find no error as to the trial court's ruling.

conduct by the prosecutor, reversible error had occurred. We do not, however, find such extensive and cumulative array of incidents in this case and decline to reverse on this ground.[16]

## VIII.

## OTHER TRIAL ERROR

■ The remaining claims of trial error may be disposed of rather briefly. The defendant claims it was error not to permit defense witness Callen to testify about a conversation he had with one of the assistant prosecutors. The assistant prosecutor related to Callen an observation that he had of the victim and victim's mother whereby the victim's mother encouraged the victim to report the crime. This conversation was clearly hearsay as we have generally defined it as "where a witness testifies [in court] with regard to [out-of-court] statements of another for the purpose of proving the truth of the matter asserted." *Salerno v. Manchin*, 158 W.Va. 220, 213 S.E.2d 805, 809, 77 A.L. R.3d 1167, 1173 (1974). No claim is made that the statements fall within any of the recognized exceptions to the hearsay rule including Rule 804(b)(5) of the Federal Rules of Evidence which we adopted in *State v. Williams*, 162 W.Va. 348, 249 S.E.2d 752 (1978).[17]

■ The defense also contends that error was committed when during the trial the State served a subpoena to have defense witness Callen appear before the Kanawha County Grand Jury after he had concluded his testimony. The service was not made in the presence of the jury and apparently received little or no notoriety. The defendant asserts on appeal that the subpoena might have had a chilling affect on other defense witnesses. There are no specific facts asserted to show any prejudice to the defendant. We decline to find this error.

## IX.

## INSTRUCTIONAL ERROR

The defendant contends that State's Instructions Nos. 3–A and 6 [18] were confusing or misleading when read in connection with Defense Instruction No. 1. State's Instruction No. 3–A defined "sexual intercourse" following the provisions of W.Va. Code, 61–8B–1(7).[19] This statutory provision, however, broadly defines the term "sexual intercourse" in order to cover a variety of sexual acts, as we said in *State v. Carter*, 168 W.Va. 90, 282 S.E.2d 277, 279–80 (1981):

"The use of the word 'or,' which is a conjunction, expresses the legislative intent that sexual intercourse can be committed in each of the various alternative ways, with each type of prohibited contact constituting a separate offense. From this, it is apparent that the Legislature chose to broadly define the term 'sexual intercourse' so that it would cover a variety of sexual encounters." (Footnote omitted)

The State had originally offered its Instruction No. 3 which defined sexual intercourse using the statutory language applicable to the facts proved.[20] The defendant

---

16. The defendant asserts that error also occurred when the prosecutor in his closing argument referred to a question to which an objection had been sustained at trial. No objection was made to this remark during the closing argument and we, therefore, do not consider it here. *State v. Burton, supra.*

17. The predicate for triggering Rule 804(b)(5) of the Federal Rules of Evidence is that the declarant is unavailable as a witness. Here, the victim and his mother were available and did testify.

18. We do not find State's Instruction No. 6 to be erroneous since it set out the elements of third degree sexual assault under W.Va.Code, 61–8B–4. *See* note 10, *supra.*

19. W.Va.Code, 61–8B–1(7), provides:

"'Sexual intercourse' means any act between persons not married to each other involving penetration, however slight, of the female sex organ by the male sex organ or involving contact between the sex organs of one person and the mouth or anus of another person."

20. State's Instruction No. 3 stated:

"The Court instructs the jury that 'sexual intercourse' means any act between persons not married to each other involving contact between the sex organ of one person and the anus of another person."

objected to this instruction because it did not contain all of the language set out in the statute. The trial court granted this objection and the State then offered its Instruction No. 3–A.

We decline to find State's Instruction No. 3–A erroneous for several reasons. Foremost, the defendant brought about its use by his objection to State's Instruction No. 3. Although the doctrine of "invited error" is not directly applicable since it ordinarily involves giving an erroneous instruction by a party who then complains about it on appeal, it can be viewed of some relevance. *State v. Woods*, 155 W.Va. 344, 184 S.E.2d 130 (1971). *See also State v. Dozier*, 163 W.Va. 192, 255 S.E.2d 552, 554 (1979).

■ Furthermore, the fact that State's Instruction No. 3–A was broader than it needed to be since it included all of the acts that make up the statutory definition of "sexual intercourse," does not mean that it was fatally defective and, therefore, reversible error. It was not an erroneous statement of our law but rather one that might be confusing in view of the fact that it covered legal definitions of sexual intercourse that were not presented in the evidence. Certainly, some of the confusion was clarified by Defense Instruction No. 1 which defined "sexual intercourse" solely under the facts presented.[21] In Syllabus Point 4 of *State v. Stone*, 165 W.Va. 266, 268 S.E.2d 50 (1980), we stated:

"The giving of confusing or incomplete instructions does not constitute reversible error where a reading and consideration of the instructions as a whole cure any defects in the complained of instructions."

■ In view of the foregoing, we decline to find that State's Instruction No. 3–A constituted reversible error.

---

21. Defense Instruction No. 1 stated:
    "The Court instructs the jury that the defendant, Clyde H. Richey, is charged in the indictment with unlawfully and feloniously engaging in an act of sexual intercourse, to-wit: penetration of the anus by the sex organ upon [the victim]."

## X.

## CONCLUSION

Finding no reversible error in the defendant's assignments of error, we therefore affirm the judgment of the Circuit Court of Kanawha County.

Affirmed.

"Accordingly, you are instructed that unless you believe that the evidence in this case established that fact beyond a reasonable doubt, you are required in law to find the defendant, Clyde H. Richey, not guilty and acquit him."